Trudy SPENCE–PARKER, Plaintiff,

v.

The MARYLAND INSURANCE GROUP et al., Defendants.

Civil Action No. 95–1322–A.

United States District Court,
E.D. Virginia,
Alexandria Division.

Aug. 21, 1996.

---

Peter D. Greenspun, Peter D. Greenspun & Associates, P.C., Fairfax, Virginia, Jonathan D. Bennett, Bennett & Ruder, P.C., Cherry Hill, New Jersey, Thomas F. Koerner, Jr., Fairfax, Virginia, for Plaintiff.

Edward J. Longosz, II, Amy S. Owen, Miles & Stockbridge, P.C., Fairfax, Virginia, Douglas M. Palais, William A. DeVan, Mezzullo & McCandlish, Richmond, Virginia, for Defendants.

## MEMORANDUM OPINION

ELLIS, District Judge.

This otherwise routine insurance coverage dispute has an unusual twist: It involves an attack on a consent judgment allegedly obtained through fraud or collusion. In addition to this question, this memorandum opinion addresses two other questions: (1) the question of coverage and (2) the question whether there is a triable issue of fact concerning the allegation that the insurer acted in bad faith in denying coverage and refusing to defend.

### I

On July 29, 1992, plaintiff Trudy Spence–Parker attended a company picnic arranged by her employer at the time, AT & T. The purpose of the picnic was to foster employee camaraderie, *esprit de corps,* teamwork, and cooperation. To this end, AT & T hired a small company, Games People Play, Inc. ("GPP"), to organize and supervise a set of games or competitions designed to instill these values in participating employees. In the course of participating in one of these games, Spence–Parker severely injured her back. As a result, she filed a personal injury suit against GPP in July 1994 in the United States District Court for the District of New Jersey. On receiving notice of the action, GPP contacted its liability insurer, Northern Insurance Company ("Northern"), which, after review, refused either to defend the suit or to indemnify GPP, contending that an "Athletic or Sports Participant" exclusion clause excluded coverage for the incident.

For reasons not clear in this record, nor material to the dispute, GPP initially failed to answer the complaint, and a default judgment was entered. Thereafter, GPP retained counsel and successfully persuaded the New Jersey district court to set the default judgment aside and transfer the case to the Eastern District of Virginia pursuant to 28 U.S.C. § 1404(a). Following the transfer, it appears that GPP did not vigorously defend the action. Thus, GPP served no discovery on Spence–Parker, took no depositions, and did not investigate the incident or interview any eyewitnesses apart from the three GPP employees present at the picnic

on the day of the injury. Moreover, GPP did not investigate Spence–Parker's prior work or medical history, and did not seek to determine whether there might be other sources of insurance coverage. Although GPP, by counsel, reviewed reports prepared by Spence–Parker's experts in medicine, rehabilitation, and economics, it neither retained experts of its own, nor interviewed or deposed those retained by Spence–Parker. Yet, it apparently evaluated the claim, as it made a Rule 68, Fed.R.Civ.P., offer of judgment for $50,000, which was refused.

At the Pretrial Conference on April 20, 1995, Spence–Parker, by counsel, filed two binders of exhibits containing the expert medical and vocational reports supporting her claims. GPP filed no exhibits. Instead, GPP's counsel informed the presiding district judge, the Honorable Albert V. Bryan, Jr., that GPP had admitted liability, that a settlement was likely, and that GPP's counsel did not intend to participate in any future proceedings. Counsel also jointly requested that Judge Bryan review Spence–Parker's submissions and approve the settlement. Judge Bryan agreed to do so.

Pursuant to their representations, counsel presented Judge Bryan with a Final Consent Judgment in which GPP agreed that Spence–Parker's damages were $3.5 million. Counsel also submitted the parties' Forbearance Agreement in which Spence–Parker agreed not to collect the $3.5 million judgment from GPP, and GPP, in turn, assigned to Spence–Parker any cause of action it might have against its insurer for refusing to defend or indemnify. Spence–Parker's counsel's letter accompanying the consent judgment invited Judge Bryan to conclude that the settlement had been reached on the merits. Specifically, it stated that "Parker,[1] having fully prepared their case for trial, and GPP, having agreed to assign all of its claims against its carrier and insurance agent to Parker, nevertheless wish to avoid any subsequent allegations that the case was settled without regard to the merits." The letter further stated that:

As is evident from the above documents, all counsel and the parties have 'signed off'

on the settlement pending, of course, Your Honor's approval. In light of the fact that the parties have fashioned what to them is an acceptable settlement, we hope Your Honor will find the same amply documented and deserving of the Court's approval.

Although paragraph 6 of the Forbearance Agreement, which accompanied the letter, stated that Spence–Parker had agreed to forego collection of the judgment from GPP, Spence–Parker's counsel's letter did not explicitly refer to this fact.

Judge Bryan entered the consent judgment awarding Spence–Parker $3.5 million in damages based in part, as we now know, on the mistaken assumption that the settlement figure had been arrived at as the result of arms' length bargaining in an adversarial context. In fact, nothing like this occurred. There was no bargaining and no money changed hands. Instead, the figure was set solely by Spence–Parker's counsel, and GPP's counsel had no interest in the amount, nor any incentive to dispute it. As GPP's counsel stated in his deposition, the amount of the settlement did not matter to him because his client would not be called upon to pay it. Further, he understood that Judge Bryan would independently determine the reasonableness of the award, and that the $1 million limit in the policy would cap the damages in any event. He also testified that no amount other than $3.5 million was ever discussed, that it was unilaterally chosen by Spence–Parker's counsel, and that the amount was not subject to any negotiation. When asked whether he was surprised when he first learned of the $3.5 million figure, GPP's counsel said, "Yes.... I didn't have an expectation, but certainly not one that high." Similarly, GPP's owner testified that the figure appeared to him to be "ridiculously high." Indeed, in his deposition, the owner denied responsibility for the accident and stated that such was his position at the time of settlement. None of this was ever reported to Judge Bryan prior to his entry of the consent judgment. Nor was it revealed to Judge Bryan that GPP's counsel had not

1. Plaintiff's last name at the time was Parker.

retained experts, interviewed witnesses, or otherwise vigorously defended the action.

Soon after the entry of the consent judgment, Spence–Parker filed this action against Northern to recover the $3.5 million, relying on the consent judgment and on the assignment of claims in the Forbearance Agreement.[2] In the course of preliminary hearings before this district judge, it became apparent that the validity of the consent judgment lay at the heart of the case. Deeming it appropriate that any such challenges be heard by the district judge who entered the order, the Court advised counsel that any motions that called into question the validity of that judgment would be referred to Judge Bryan for disposition. Accordingly, when Spence–Parker later sought summary judgment, contending that the undisputed facts established the existence of coverage and that the factual findings contained in the consent judgment established no fraud or collusion, her motion was heard by Judge Bryan. In a Memorandum Opinion and Order dated March 15, 1996, Judge Bryan denied Spence–Parker's motion for summary judgment. *Spence Parker v. The Maryland Casualty,* Civ. No. 95–1322–A, Memorandum Opinion and Order (E.D.Va. March 15, 1996) [hereinafter March 15th Memorandum Opinion and Order]. More specifically, he stated that although he accepted counsels' representations that they had asked him at the pretrial conference to make an independent inquiry as to the reasonableness of the impending settlement, he had no present recollection of that conversation. He also clarified that, although the consent judgment recites that the court found the settlement not to be the product of fraud or collusion, he had, in fact, made no such finding.[3] Indeed, he noted that the record in this case, "with the benefit of hind-

sight and later developments, is supportive of facts from which an inference of collusion can be drawn." *Id.* at 5. Finally, the March 15th Memorandum Opinion and Order establishes that Judge Bryan never made an independent assessment as to the reasonableness of the $3.5 million figure.

Following the completion of discovery, Northern moved for summary judgment on the issues of fraud or collusion, bad faith, and misrepresentation. For her part, Spence–Parker again sought summary judgment on the issues of coverage and fraud or collusion. Judge Bryan referred the matter back to this district judge out of a concern that he might be called as a witness at the trial on the issue of fraud or collusion. Following oral argument, the Court, ruling from the bench, granted Spence–Parker's motion for summary judgment on the issue of coverage and granted Northern's motion for summary judgment on the issues of bad faith and misrepresentation. The Court initially took under advisement the question of fraud or collusion and directed the parties to file supplemental memoranda on the issue. The parties complied and, at a subsequent hearing, the Court announced its decision, elaborated here, that the consent judgment is the product of constructive fraud and collusion. Accordingly, this memorandum opinion recites in more detail the rulings as to the portions of the motions initially disposed of from the bench and sets forth the reasons for the later ruling on the issue of fraud or collusion.

## II

■ The threshold issue is coverage, namely whether Northern was obligated under GPP's liability insurance policy to indemnify GPP for Spence–Parker's injuries. The

---

**2.** As originally filed, the complaint also included claims against the insurance agents who procured the policy for GPP. Spence–Parker alleged that the agents were liable for breach of contract for providing a policy that did not provide appropriate coverage for GPP's business operations, specifically one that covered Spence–Parker's injuries. In addition to amounting to a breach of contract, this failure to provide adequate coverage was alleged to amount to negligence, to the detriment of GPP and Spence–Parker. Thus, both claims were predicated on the notion that the agents knew Nelson wanted

coverage for injury to participants, yet failed to procure such a policy. Given the conclusion, set forth in section II, *infra,* that there was coverage, the agents did procure the requested policy coverage, and hence the claims against the agents necessarily fail.

**3.** In effect, then, the March 15th Memorandum Opinion and Order vacated certain factual findings contained in the consent judgment of June 9, 1995.

absence of coverage would be dispositive of this action. On the other hand, the existence of coverage requires that the remaining issues of bad faith and fraud or collusion be reached and resolved.

Northern refused to defend or indemnify GPP on the basis of a policy provision excluding coverage for "bodily injury to any person while practicing for or participating in any sports or athletic contest or exhibition that you sponsor." The parties do not dispute that the term "you" in the provision refers to the insured, GPP. But the parties sharply dispute whether the picnic games, furnished by GPP, including the one in which Spence–Parker was participating when injured, were "sponsored" by GPP. Thus, the dispositive coverage question is whether GPP was a "sponsor" of the "contest or exhibition" in which Spence–Parker was injured.[4]

The term "sponsor" is not defined in the policy. In these circumstances, the word must be given its plain and ordinary meaning, as with all undefined terms in insurance policies. *See State Farm Fire & Casualty Co. v. Walton,* 244 Va. 498, 423 S.E.2d 188, 191 (1992). One plain, ordinary definition of "sponsor" is a "person or agency that acts as endorser, proponent, adviser, surety, etc. for a person, group or activity." *Webster's New World Dictionary,* 723 (2d concise ed. 1982). Yet this is not the only accepted meaning of the word; other meanings include "[o]ne that finances a project or an event carried out by another," *The American Heritage College Dictionary* 1315 (3d ed. 1993), or, defining the verb, "to pay or contribute towards the expenses of a radio or television program, a performance, or other event or work in return for advertising space or rights." 16 *Oxford English Dictionary,* 306 (2d ed. 1989). These somewhat different definitions yield quite disparate results in the context of this case. If the first definition of "sponsor" were used, the exclusion clause would apply to GPP, because although GPP was not a surety, it could be viewed as a proponent or endorser of the activity in the sense that it told the 500 employees that the activities

would be enjoyable and educational. And GPP was also an adviser in that it instructed the employees in how to participate in the games. But applying either of the latter definitions would compel the opposite conclusion. GPP did not finance an event carried out by AT & T; on the contrary, it provided a service to AT & T for a price. It is apparent, therefore, that "sponsor" is amenable to varying definitions, some of which describe GPP's role with respect to the games, while others do not. In cases such as this, "[w]here two constructions are equally possible," or where "reasonable [persons] . . . may reach reasonable, but opposite, conclusions" as to whether the word applies to a particular situation, the word is ambiguous. *St. Paul Fire & Marine Ins. v. S.L. Nusbaum & Co.,* 227 Va. 407, 316 S.E.2d 734, 736 (1984).

In the case of ambiguity, Virginia laws allows for "the introduction of parol [evidence] to establish the circumstances under which the contract was made, and the declarations of the parties, made at the time, as to the true meaning of the language used." *State Farm Mut. Auto. Ins. Co. v. Justis,* 168 Va. 158, 190 S.E. 163, 166 (1937). It is appropriate then to consider in this case relevant parol evidence, that is evidence prior to the execution of the contract indicative of the parties' intentions with respect to the meaning of the term "sponsor." Although the record does not reveal that the parties ever discussed the specific exclusion or the word "sponsor" itself, there is evidence on why Jan Nelson, the owner of GPP, sought the insurance policy. That evidence, however, is in conflict.

The defendants, for example, identify certain evidence from which can reasonably be drawn the inference that Nelson was not interested in obtaining liability coverage in the case of injury to a participant in a game. In an affidavit, Patricia Rutter, the person who took the initial insurance application from Nelson in 1988, states that she has no present recollection of meeting with Nelson, but that her notes reflect that he sought

---

**4.** Spence–Parker concedes, as she must, that the game in which she was injured was a "sports or athletic contest or exhibition."

insurance because he needed to provide a certificate of insurance for a site on which he planned to coordinate games. She does not recall that he said he wanted coverage for bodily injury to participants in the games. Similarly, defendant John Laycock, the insurance agent who procured the policy at issue, contends in his deposition that Nelson did not ask him for coverage for bodily injury to participants. Even after being sued by Spence–Parker, Nelson did not ask to have the exclusion removed.

For her part, Spence–Parker points to Nelson's own deposition testimony that he had desired liability coverage for injury to participants. When Nelson was asked whether he had expressed "any concern or specifically ask for insurance coverage for participants in these games," he replied, "Yes, I did.... [T]he reason I was there was I was concerned about the liability status for the company, as well as if anybody is hurt during the course of activities as well." This statement stands in stark contrast to Laycock and Rutter's recollection that Nelson did not want coverage of that scope. Accordingly, reference to parol evidence does not resolve the ambiguity of the word "sponsor" as used in the policy.

If, after examining the relevant parol evidence, the meaning of the word or phrase remains ambiguous, then:

> [t]he courts ... have been consistent in construing the language of [insurance] policies ... in favor of that interpretation which grants coverage, rather than that which withholds it.... Language in a policy purporting to exclude certain events from coverage will be construed most strongly against the insurer.

\*　\*　\*　\*　\*　\*

It [is] incumbent upon the insurer to employ exclusionary language clear enough to avoid any such ambiguity.

*St. Paul,* 316 S.E.2d at 736. Faced with such an ambiguity here, it is appropriate to construe it against the drafter of the policy, namely Northern. As a consequence, summary judgment in favor of Spence–Parker is appropriate on her declaratory judgment action and as to liability on the breach of contract count.[5]

The conclusion that there was coverage under the policy for Spence–Parker's claim against GPP also disposes of Spence–Parker's claim of misrepresentation and fraud against Northern. To establish fraud she must show (i) a false representation, (ii) of a material fact, (iii) made intentionally and knowingly, (iv) with intent to mislead, (v) reliance by the misled party, and (vi) resulting injury to the party misled. *Pennsylvania Life Ins. Co. v. Bumbrey,* 665 F.Supp. 1190, 1200 (E.D.Va.1987); *Winn v. Aleda Construction Co.,* 227 Va. 304, 315 S.E.2d 193, 195 (1984). Spence–Parker alleges that Northern "represented" that the policy covered GPP's liability for personal injury sustained by participants in its games. In light of the conclusion that coverage did exist here, Northern made no misrepresentation and there can be no fraud. This count, therefore, must be dismissed.

### III

The next issue involves whether a triable issue of fact exists concerning Spence–Parker's allegation that Northern acted in bad faith in denying coverage and a defense. If Northern is ultimately found not to have acted in bad faith, then Spence–Parker, as GPP's assignee, may only recover up to the policy's relevant coverage limita-

---

5. *Ruppa v. American States Ins. Co.,* 91 Wis.2d 628, 284 N.W.2d 318 (1979), on which Northern relies, does not require a different conclusion. There, plaintiff was injured while participating in a horse show conducted annually by the Madison Saddle Club, which was financially responsible for the horse show, paying for it out of ticket sales and club dues. Ruppa brought suit against the Club, alleging negligence in its failure to maintain a safe and suitable place for the show. The Club relied on a clause in a liability waiver signed by Ruppa, in which he agreed that "the sponsors of the [show] shall not under any circumstances be liable or responsible for any injury" resulting from his participation in the show. The court held, without any discussion, that the Club was a "sponsor." Yet, the case is distinguishable; the Club's role differed from GPP's in that the Club was financially responsible for the show and put on the show as the club's primary activity, using the Club's accrued financial surplus to promote an interest in horses. GPP, on the other hand, was providing AT & T a service for a fee.

tions, which the parties agree is $1 million in this case. But if Northern acted in bad faith, then Spence–Parker may recover an amount in excess of the policy limits. *See Bettius & Sanderson, P.C. v. National Union Fire Ins. Co.,* 839 F.2d 1009, 1016–17 (4th Cir.1988).

The test for ascertaining whether an insurer acted in bad faith is found in *CUNA Mut. Ins. v. Norman,* 237 Va. 33, 375 S.E.2d 724, 726–27 (1989). Application of this test to specific cases requires consideration of five factors:

1. whether reasonable minds could differ in the interpretation of the policy provisions defining coverage and exclusions;

2. whether the insurer made a reasonable investigation of the facts;

3. whether the information in the investigation supported the denial;

4. whether the insurer denied coverage as a negotiating tactic; and

5. whether the insurer's defense raises issues of first impression or a reasonably debatable question of law or fact.

*See id.* 375 S.E.2d at 727. To be sure, *CUNA Mutual* involved an insurer's breach of the duty to provide coverage, rather than the broader duty to defend that is at issue in this case. *See Fuisz v. Selective Ins. Co.,* 61 F.3d 238, 241 (4th Cir.1995). Yet, this difference is not significant, for the Virginia Supreme Court has applied the same five factors to an insurer's refusal to provide a defense. *See Scottsdale Ins. Co. v. Glick,* 240 Va. 283, 397 S.E.2d 105, 109 (1990).

The first factor focuses on the policy exclusion relied on by the insurer and asks, *in essence whether it might reasonably be read,* as the insurer did, mistakenly, to exclude coverage. In other words, this first *factor questions whether the policy exclusion is sufficiently infected with ambiguity so that the insurer's reading of it, while mistaken, was nonetheless sufficiently plausible so as to negate or at least discourage any inference of* bad purpose. An affirmative answer to this question is compelled in this case. The exclusion provision in issue is undeniably ambiguous, a fact compellingly attested to by the lawyers' arguments here. The simple fact is that numerous reasonable minds could, and indeed did, differ about the interpretation of that provision. This factor, therefore, points persuasively, if not conclusively, away from any inference of bad faith. *To hold otherwise would require insurers to meet an unattainable standard of interpretive accuracy.*

The second factor calls for an inquiry into the nature and extent of Northern's investigation of the claim. In this regard, for example, a perfunctory inquiry, or no inquiry at all, by the insurer would permit or invite an inference of bad faith. But no such thing occurred here. To the contrary, the undisputed facts here disclose an inquiry which, *while not flawless, was reasonable and typical* in the circumstances. Thus, the record reflects that after receiving notice of the New Jersey action, GPP tendered defense to Northern. At Northern, the claim was originally reviewed by Sheri Olson, the litigation manager, who referred it to Pat Ceccaci, the team leader, who then assigned it to Michele Rolleri, a Senior Claims Representative. Rolleri acknowledged receipt of the complaint and instructed GPP to complete and return to plaintiff's counsel the waiver of service of summons. Rolleri reviewed the suit papers, which alleged, *inter alia,* that the games were "sponsored" by GPP. In addition, Rolleri spoke several times with Nelson, GPP's owner, and took his recorded statement. Furthermore, she spoke to counsel for Spence–Parker about the facts of the case. On the basis of this review, Rolleri decided that coverage was not available and reviewed the decision with her supervisor, Ceccaci. She then submitted it to the Claims Committee for review. This committee consisted of Rolleri, Ceccaci and a third person. Each concluded on the information available that no coverage existed. A denial letter was drafted, which was first reviewed by attorney Olson, and then sent to the Home Office Examiner, John Donovan, who spent about an hour reviewing the entire file, spoke with a stand-in for Rolleri, who was sick, and concurred that the Athletic Exclusion was applicable in the circumstances and hence there was no coverage. Then, on September 23, 1994, Rolleri sent GPP a letter denying

coverage although she had earlier (August 30) advised them orally that a denial of coverage was likely. The coverage denial letter, which was copied and sent to plaintiff's counsel, invited questions from GPP, but neither GPP nor counsel for Spence–Parker had any further contact with Northern until this suit was filed. Northern has also retained an insurance expert in this case, Ronald Coleman, who states that Northern's review "completely, thoroughly, and systematically investigated the circumstances of coverage" and that the review exceeded the standard of care for claims handling in the industry.

■ However, Spence–Parker sees a failure by Northern to "adequately explore the sponsorship issue." In support, she points out that some of the claims representatives had not dealt previously with the athletic exclusion before. Given this fact, she finds it significant that none of them consulted any case law, internal manuals or handbooks that might have construed the term "sponsor." Yet, she offers no persuasive evidence that Northern purportedly violated any established handbook procedures in bad faith.[6] She also notes that Rolleri, Cecacci and Donovan were unfamiliar with Virginia law. While it might reflect special prudence on an insurer's part to require reviewers of Virginia claims to be versed in Virginia law, it does not bespeak an insurer's bad faith for this not to be the case, especially where, as here, the coverage issue does not pivot on any peculiar aspect of Virginia law. Rather, it turns on straightforward principles that generally obtain in all jurisdictions. Finally, Spence–Parker adds that she finds it highly significant that Northern never asked Nelson whether he was the "sponsor" of the event in question. Yet Nelson's self-interested, personal, lay interpretation of whether he was a "sponsor" on that day would have had little effect on Northern's determination of cover-

age. In sum, the undisputed facts concerning Northern's review of the claim invites no inference of bad faith.

The third factor also focuses on Northern's investigation and explores whether that investigation supported the coverage denial. It did. Thus, the investigation revealed that Spence–Parker was injured while participating in an athletic event and that GPP was in charge of and coordinated the activity. Northern's inquiry also confirmed that GPP supplied the equipment and the personnel to oversee the games, set up the games at the site, organized the participants into teams, and taught the participants how to play the various games. This investigation supported, although not conclusively, Northern's conclusion that GPP was the games' "sponsor" and that the policy exclusion, therefore, applied.

The fourth factor considers whether the coverage denial was a negotiating tactic. Were this so, bad faith on the insurer's part might be inferred. Yet, Spence–Parker has pointed to no evidence that Northern's denial could be construed as a negotiating tactic.

And finally, the fifth factor focuses on the nature and difficulty of the coverage issue. This factor, like the others, invites no inference of insurer bad faith. The issue was relatively novel; the parties have identified no case that discusses the definition of "sponsor" in this context. And, as the parties' briefs and arguments on this point confirm, both Northern's interpretation and the issue of coverage were "reasonably debatable."[7]

In sum, Spence–Parker has failed to show evidence from which a jury could conclude that Northern acted in bad faith in denying coverage. Summary judgment should be granted for Northern on this issue; accordingly, Spence–Parker's recovery is limited by the terms of the policy to $1 million.

---

6. Contemporaneous with the issuance of this Memorandum Opinion, Spence–Parker filed a motion for reconsideration directed at a number of issues, including failures to comply with handbook procedures.

7. Further support for this point is found in Judge Bryan's March 15th Memorandum Opinion and Order. There, although he makes no finding concerning coverage, he intimates nonetheless

that the policy affords no coverage in the circumstances. Specifically, he states "there was an exclusion in the policy which on its face seems to apply to the activity in which the plaintiff was engaged at the time of her injury." *Id.* at 6. Given our apparent judicial disagreement in interpreting the policy, Northern's denial of coverage hardly raises the proverbial "red-flag."

## IV

The remaining inquiry entails whether Northern is bound by the $3.5 million figure—now reduced to $1 million by operation of the policy limits—or whether, instead, Northern may challenge the reasonableness of that amount. As the recent case of *Liberty Mutual Ins. Co. v. Eades*, 248 Va. 285, 448 S.E.2d 631 (1994), makes clear, resolution of that question requires Northern to establish by clear and convincing evidence that the consent judgment, the conclusive effect of which it seeks to avoid, was the product of "fraud or collusion". *Id.*, 448 S.E.2d at 632. In *Eades*, the plaintiff, injured by one of the insured's vehicles, filed suit against the insured. After the insured's liability carrier denied coverage, plaintiff and the insured reached a settlement and submitted a stipulation to the trial court requesting dismissal of the case and entry of judgment in favor of plaintiff for $40,000. As part of the settlement, plaintiff agreed not to seek collection of the judgment against the insured, and the insured later assigned to plaintiff all claims against the insurer. The court approved the settlement and thereafter sued the insurer. In the course of the trial in that case, the insurer sought to introduce evidence that the amount of the underlying judgment was unreasonable. The trial court held that the insurer was precluded from challenging the reasonableness of the amount of the judgment, unless it could establish fraud or collusion in the procurement of the judgment. So instructed, the jury found that the insurer had failed to establish fraud or collusion, and judgment was entered against the insurer in the amount of $40,000. On appeal, the Supreme Court of Virginia affirmed, stating that

"[a] consent judgment entered upon a stipulation of the parties requires judicial action by the court and therefore is valid, has substantially the same effect as any other judgment, is conclusive of the matters adjudicated, [and] is not subject to collateral attack except upon jurisdictional grounds or for fraud or collusion. . . . This is true even though the judgment is contractual in nature and is based wholly upon the parties' agreement, which renders preliminary adjudication of the facts or the law applicable to the controversy unnecessary." *Id.* 448 S.E.2d at 633.[8]

It is clear, then, that Northern is bound by the $3.5 million figure and may not litigate whether that figure accurately reflects the extent of Spence–Parker's injuries unless it can establish by clear and convincing evidence that the consent judgment was the product of "fraud or collusion."[9] Less clear, however, is precisely what conduct in this context is encompassed by the phrase "fraud or collusion."

In Virginia, fraud is well-defined; Virginia law recognizes both actual and constructive fraud. *Diaz Vicente v. Obenauer*, 736 F.Supp. 679, 690 (E.D.Va.1990); *Moore v. Gregory*, 146 Va. 504, 131 S.E. 692, 697 (1925). Actual fraud is intentional fraud, and its elements are: (i) a false representation, (ii) of a material fact, (iii) made intentionally and knowingly, (iv) with intent to mislead, (v) reliance by the misled party, and (vi) resulting injury to the party misled. *Pennsylvania Life Ins. Co. v. Bumbrey*, 665 F.Supp. 1190, 1200 (E.D.Va.1987); *Winn v. Aleda Construction Co.*, 227 Va. 304, 315 S.E.2d 193, 195 (1984). Constructive fraud, in contrast, is "a breach of legal or equitable duty, which, irrespective of moral guilt . . . the law declares fraudulent, because of its tendency

---

**8.** This standard differs from that applicable in other jurisdictions, where an insurer is permitted to attack collaterally a consent judgment by showing either that it was obtained by fraud or collusion or that the settlement amount was not reasonable and prudent. *See, e.g., Lozier v. Auto Owners Ins. Co.*, 951 F.2d 251 (9th Cir.1991) (applying Arizona law); *Miller v. Shugart*, 316 N.W.2d 729 (Minn.1982); *Steil v. Florida Physicians' Ins. Reciprocal*, 448 So.2d 589 (Fla.Dist. Ct.App.1984). *Eades*, however, apparently rejected such a standard. *See Eades*, 448 S.E.2d at 633. ("[T]he insurer argues, mainly relying on

cases from other jurisdictions, that the plaintiff's stipulated judgment is not conclusive upon the insurer until the insurer has an opportunity to litigate not only whether the judgment was a product of collusion but also whether the judgment reflects a reasonable and prudent settlement.").

**9.** There is no contention here that the court that entered the consent judgment was without jurisdiction to enter the judgment.

to deceive others, to violate public or private confidence, or to injure public interests." *Moore,* 131 S.E. at 697. It exists "in cases in which conduct, although not actually fraudulent, ought to be so treated...." *White v. National Steel Corp.,* 742 F.Supp. 312, 337 (N.D.W.Va.1989). "To establish constructive fraud, one must prove ... by clear, cogent and convincing evidence ... [i] that there was a material false representation, [ii] that the hearer believed it to be true, [iii] that it was meant to be acted on, [iv] that it was acted on, and [v] that damage was sustained." *Webb v. Webb,* 16 Va.App. 486, 431 S.E.2d 55, 59 (1993). Thus, constructive fraud does not require scienter or intent to mislead; it can be established whether the representation is innocently or knowingly made. *Chandler v. Satchell,* 160 Va. 160, 168 S.E. 744, 748 (1933).

Although fraud of the actual variety is more commonly the basis of a collateral attack on a judgment entered by a court of competent jurisdiction, it appears that fraud on the court can also be established by proof of constructive fraud. *See, e.g., Kitchen v. Throckmorton,* 223 Va. 164, 286 S.E.2d 673, 676, 678–79 (1982). In *Kitchen,* estate beneficiaries brought suit against the estate administrator, alleging that she had fraudulently distributed the estate in a manner so as to constitute constructive fraud on the court and the beneficiaries. It seems that the administrator, following her appointment, filed various pleadings that led the court to believe that the deceased had died intestate, and that the administrator was seeking to recover the estate's assets in order to distribute them according to the laws of descent and distribution. In fact, as the administrator knew, the deceased had given certain instructions regarding the disposition of his estate to his nephew, and further, the parties already knew in which banks the estate's assets were located. The misimpressions created by the pleadings were never corrected, and the court found that the chancery court acted in reliance on those misimpres-

sions. The court concluded that these facts established constructive fraud on the court. In sum, constructive, as well as actual, fraud on the court may furnish a basis for vitiating an order.[10]

But fraud is not the sole basis on which a consent judgment may be attacked; *Eades* uses the phrase "fraud or collusion" and it is therefore necessary to consider what conduct is encompassed within "collusion" and whether it is any different from fraud. A commonly accepted definition of "collusion" is "[a]n agreement between two or more persons to defraud a person of his rights by the forms of law, or to obtain an object forbidden by law. It implies the existence of fraud of some kind, the employment of fraudulent means, or of lawful means for the accomplishment of an unlawful purpose." *Black's Law Dictionary* 240 (5th ed. 1979). In essence, collusion is simply fraud accomplished by two or more persons. As such, it incorporates, but does not substantively expand the kind of conduct that constitutes actual or constructive fraud. Thus, "fraud or collusion" seems simply to mean fraud, actual or constructive, perpetrated by one person acting alone or several persons acting jointly. While this definition seems to render "collusion" somewhat redundant, it is worth noting that it is not a statute that is explicated here, but a common law judicial opinion, whose language is not strictly subject to the familiar canon of construction teaching that language should be construed so as not to render any word superfluous. Moreover, the meaning here attributed to the phrase comports with the plain and well-established meaning of the phrases' constituent words. No case has been cited or found to the contrary.

With these principles in mind, the dispositive issue involves whether the consent judgment was the product of "fraud or collusion". Many of the material facts are undisputed and have already been recited. The first question is whether this record establishes, as a matter of law, that the

---

**10.** *See also First National Bank of Lawrence County v. Higginbotham Funeral Service, Inc.,* 36 Ark.App. 65, 818 S.W.2d 583 (1991) (affirming the setting aside of a consent judgment on a note where the plaintiff bank in the first action knew that there was a substantial question whether opposing counsel was authorized to act for the defendant yet did not inform the court of that fact).

consent judgment was the result of actual fraud. It plainly does not; indeed, there is no factual basis for believing that deceit played any role in these events. As a consequence, no reasonable jury could find that the parties or their counsel deliberately intended to mislead the Court.

The matter of constructive fraud stands on different footing because an intent to mislead is not an element of constructive fraud. The first element of such a claim requires that the party have made a material false representation. The purported misrepresentation at issue is Spence–Parker's and GPP's counsels' failure to advise Judge Bryan that the settlement they asked the Court to approve was not the product of arms-length negotiation in an adversarial setting. Their silence in this regard amounts to a misrepresentation because counsel were under a duty to disclose that fact to the Court. *See, e.g.,* EC 7–17, Va.Code of Prof'l Resp. ("In order to function properly, our adjudicative process requires an informed, impartial tribunal.... [T]here must be competent, adverse presentation of evidence and issues...."). Although there may have been indications in the full record that the parties were not in fact adverse, Spence–Parker concedes that Judge Bryan was never expressly informed of the non-adversarial nature of the settlement. Nor was he told that GPP and its counsel played no role whatsoever in setting the $3.5 million figure and that both GPP's owners were surprised by it, one feeling it was high and the other feeling it was "ridiculously high". Accordingly, Judge Bryan had no reason to scour the record, but was instead invited to proceed on the mistaken assumption that the parties were truly adverse. And the record reflects that such was the assumption of the Court. *See* March 15th Memorandum Opinion and Order (making clear that because the parties did not offer contrary representations, Judge Bryan assumed that they were adverse). Their failure to inform Judge Bryan about the non-adversarial nature of the settlement amounted to a material false representation. Consequently, the first element of constructive fraud is established by clear and convincing evidence.

The other four elements are also established by undisputed, clear and convincing evidence in the record. Judge Bryan, as discussed, plainly believed the parties were adverse; the March 15th Memorandum Opinion and Order makes clear that the Court had no reason to believe otherwise. Next, the representation was meant to induce action. The parties presented the proposed settlement to Judge Bryan asking him to enter judgment in accordance with the terms of that settlement. And the representation was acted on; Judge Bryan entered the requested judgment by Order dated June 9, 1995. Finally, damage to the judicial process was sustained. Courts rely on counsel to inform them fully as to all facts and circumstances that might materially affect the court in reaching a decision. Judge Bryan was not so informed in this instance. That is not to say that counsel acted deceitfully; but the concept of fraud on the court encompasses "that species of fraud which does or attempts to, subvert the integrity of the court itself, or is a fraud perpetrated by officers of the court so that the judicial machinery cannot perform in the usual manner its impartial task of adjudging cases that are presented for adjudication." 7 Moore's Federal Practice ¶ 60.33 at 60–360 (2d ed. 1995). Here, Judge Bryan was entitled to rely on the parties to present him with all relevant information. Their failure to do so in this instance constitutes constructive fraud by clear and convincing evidence, and, accordingly, the consent judgment must be set aside.

Seeking to avoid this result, Spence–Parker argues that Northern should not be permitted to challenge the reasonableness of the settlement amount for two reasons. First, she contends Northern is estopped from challenging the consent judgment. This contention is unpersuasive. Estoppel prevents a party from denying a previous statement of fact on which a person relied to her detriment. Northern's "statement," Spence–Parker contends, was that its policy did not provide coverage for liability for Spence–Parker's injury. Although that assessment has now been held to have been in error, Northern has not asserted anything in conflict with that representation, and the doctrine of estoppel is inapplicable.

Second, Spence–Parker argues that public policy prevents Northern from challenging the consent judgment. She contends that insurers should not be permitted to refuse to defend an insured, wait and see how the underlying suit plays out, and then attack both the coverage issue and the underlying judgment. To be sure, courts should avoid fashioning rules and reaching results that encourage or reward insurers for wrongfully declining coverage and defense. Neither *Eades,* nor its application to this case does this. To the contrary, the law properly provides powerful incentives to insurers to meet their policy obligations and to act in good faith in deciding whether the policy covers a particular event. Thus, where, as here, an insurer acts in good faith, but mistakenly concludes that the policy excludes coverage, the insurer will be liable for the costs of defense and any damages recovered up to the policy limits. If the insurer acts in bad faith, then, of course, its liability may be much greater and is not limited to the policy limits. These powerful incentives inhere in already settled legal rules and remain unaffected by the result reached here. In short, this case is not about incentives for insurers; rather, this case concerns the integrity of the judicial process. Lawyers seeking entry of a settlement consent judgment have a special obligation to ensure that the court is fully and accurately informed of all material facts related to the proffered order. Where, as here, the lawyers, without any deceitful intent, fail to do so, and where the judge therefore proceeds on a mistaken, but invited assumption, the result is a distortion of the judicial process, which cries out for correction. The proper remedy, therefore, is to return the matter to Judge Bryan, who states that he, in fact, made no previous findings, to allow him to consider, now that he is fully informed as to the circumstances, whether the proffered findings are warranted.

Accordingly, Northern's motion for summary judgment on the issue of fraud and collusion will be granted, and the consent judgment must be set aside.

An appropriate order will issue.

The Clerk is directed to send copies of this Memorandum Opinion to all counsel of record.