T.C. Memo. 2005-151


UNITED STATES TAX COURT


GEOFFREY K. CALDERONE, SR., Petitioner $\underline{v}$.
COMMISSIONER OF INTERNAL REVENUE, Respondent

PETER A. CALDERONE, Petitioner $\underline{v}$.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket Nos. 12253-99, 3240-00.    Filed June 23, 2005.


John T. Mulhall III, Thomas E. Redding, and Charles E. Rutherford, for petitioners.[1]

John Q. Walsh, Jr., for respondent.

---

[1] Petitioners were represented by Arthur Jacob when they filed their petition. Robert W. Hesselbacher, Jr., entered the case on July 17, 2001. Mr. Jacob and Mr. Hesselbacher withdrew on Oct. 14, 2003. Charles E. Rutherford and Mark L. Nowak entered the case on Oct. 10, 2003. Mr. Nowak withdrew on Dec. 13, 2004. Thomas E. Redding entered the case on Jan. 21, 2004. John T. Mulhall III entered the case on Mar. 25, 2004.

J purported to form a qualified employee stock ownership plan for Ps. R determined deficiencies, and J, on behalf of Ps, petitioned this Court. R believed J had a conflict of interest under Rule 24(g), Tax Court Rules of Practice and Procedure. J informed Ps as to his potential conflict of interest, received Ps' informed consent to continue representing them in the proceeding, and retained H to represent Ps as co-counsel. R informed the Court of J's potential conflict of interest during a conference call and in a pretrial memorandum. The cases settled before trial, decisions were entered, and these decisions are now final. Ps move the Court to vacate the decisions, asserting primarily that R and J did not adequately inform the Court of J's potential conflict of interest, which, in turn, constituted fraud on the Court.

Held, Ps' motion will be denied for failure to establish a fraud on the Court.

MEMORANDUM FINDINGS OF FACT AND OPINION

LARO, Judge:[2]  Petitioners move the Court for leave to file a motion under Rule 162[3] to vacate the stipulated decisions which were entered in these cases on February 21, 2002. The motion asserts that those decisions were the result of fraud on the Court. Following an evidentiary hearing on the substance of petitioners' motion, we decide whether petitioners have established a fraud on the Court sufficient for us to vacate

---

[2] These cases were reassigned to Judge David Laro on Aug. 17, 2004, by order of the Chief Judge.

[3] Unless otherwise noted, Rule references are to the Tax Court Rules of Practice and Procedure. Section references are to the applicable versions of the Internal Revenue Code.

those decisions.  We hold they have not and shall deny their motion.

FINDINGS OF FACT

I.   Background

Some facts were stipulated.  We incorporate herein by this reference the parties' stipulation of facts and the exhibits submitted therewith.  We find the stipulated facts accordingly.

In May 1979, Geoffrey K. Calderone, Sr. (Geoffrey), and his brother, Peter A. Calderone (Peter), formed the Maryland Pennysaver Group, Inc. (MPG).  Geoffrey, who resided in Fort Lauderdale, Florida, when his petition was filed, was MPG's president.  Peter, who resided in Park City, Utah, when his petition was filed, was MPG's vice president and secretary. Before January 5, 1993, Geoffrey and Peter were the only stockholders of MPG, with Geoffrey owning 51 percent and Peter owning 49 percent.

Arthur Jacob (Jacob) is a certified public accountant and was an attorney in Maryland until he was disbarred on July 22, 2003.  Jacob has known petitioners since he began providing tax services to MPG in or about 1985 or 1986.  In or about 1992, petitioners asked Jacob to review an offer from Landmark Communications, Inc., to buy all of their MPG stock.  Jacob advised petitioners to reject the offer and, instead, to sell

their MPG stock to an employee stock ownership plan (ESOP)[4] which he would form.  Petitioners accepted this advice and on January 5, 1993, sold their stock to the First Management Co., Inc. Employee Stock Ownership Plan and Trust (First Management), which Jacob formed on December 28, 1992.

Jacob, Geoffrey, Peter, and two of MPG's longtime employees, Michael Onorato (Onorato) and Wayne Morgan (Morgan), participated in the ESOP.  Before forming the ESOP, Jacob sent a letter to Geoffrey, Peter, Onorato, and Morgan advising them that his role in the formation of First Management and its subsequent purchase of stock created a likelihood of potential or perceived conflicts of interest.  Jacob advised each of the four to seek the advice of an independent attorney regarding the ESOP.  None of them did so.

As part of the consideration for petitioners' sale of their MPG stock to First Management, Jacob, as the trustee of First Management, executed a secured promissory note dated January 5, 1993.  Under the note, First Management promised to pay to Geoffrey and Peter the principal sum of $13,955,543, plus interest, in 180 equal monthly installments.  Payments under the note were made to Jacob, who accepted the payments as the representative of Geoffrey and Peter.  Petitioners gave Jacob

---

[4] We call the underlying plan an "ESOP" for convenience, not because it met the requirements of sec. 4975(e)(7).  The plan, in fact, did not meet the requirements of sec. 4975(e)(7).

authority to make decisions with respect to the sale proceeds, potentially millions of dollars.

Jacob prepared tax returns for petitioners for the relevant years. Those returns did not recognize any gain from the sale of the MPG stock to First Management but included a statement, entitled "Election to Defer Gain on Sale of Qualified Securities under Internal Revenue Code Section 1042(a)", which disclosed the date and nature of the sale to First Management. In 1995, Geoffrey, Peter, and Jacob were notified by the law firm of Weinberg & Green, LLC, who had previously represented MPG and were, at that time, representing Morgan and Onorato, that there were "problems" with the ESOP.

On July 25, 1995, Geoffrey and Peter entered into an Amended and Restated Stock Purchase Agreement drafted by Weinberg & Green, LLC (amended ESOP). Jacob was not involved in the drafting of the amended ESOP, but he signed it with Geoffrey and Peter. Under the amended ESOP, petitioners agreed that First Management failed the definition of an ESOP as set forth in section 4975(e)(7). Petitioners also agreed that they would, if necessary, file amended returns to correct the treatment of payments in prior years insofar as that treatment was inconsistent with the characterization of the purchase and sale transactions under the amended ESOP. As part of the amended ESOP, the previous promissory note was canceled and was replaced

with another secured promissory note in which First Management promised to pay petitioners the same amount of consideration, on the same terms, for their shares. When this new note was paid off in 1996, Geoffrey reported no gain from the sale on his 1996 Federal income tax return. Peter did not file a 1996 Federal income tax return.

II. Notice of Deficiency and Prior Proceedings

On April 13, 1999, respondent issued a notice of deficiency to Geoffrey for 1996, determining a deficiency of $1,952,470, an addition to tax under section 6651(a)(1) of $477,503.25, and an accuracy-related penalty under section 6662(a) of $389,466.40. Respondent determined that the payment on the note in 1996 made the remaining amount of capital gain, $6,381,649, taxable in 1996. On July 9, 1999, Geoffrey authorized Jacob to file a petition with this Court on his behalf as to 1996.

On December 20, 1999, respondent issued a similar notice of deficiency to Peter for 1996, determining a deficiency of $1,965,013, an addition to tax under section 6651(a)(1) of $478,503, and an addition to tax under section 6654 of $19,834. That notice determined that the payment in 1996 triggered recognition of capital gain of $6,156,266. On March 20, 2000, Peter authorized Jacob to file a petition with this Court on his behalf as to 1996.

Thereafter, respondent's counsel concluded Jacob might be needed as a witness at trial.  On June 11, 2001, respondent's counsel communicated this concern to Jacob through a letter that referred to Rule 24(g) and rule 3.7 of the Model Rules of Professional Conduct, and stated that respondent would for those reasons move the Court to disqualify Jacob under Rule 24(g). Jacob discussed this letter's contents with petitioners shortly after he received it.  He told Geoffrey that respondent wanted Jacob to testify regarding the formation of the ESOP, but that any such testimony could be stipulated, obviating the need for Jacob to testify.  Geoffrey told Jacob that he wanted Jacob to continue to represent him, and they agreed Jacob would remain. Jacob also discussed the subject with Peter in June 2001.  He told Peter that if Jacob had to testify at trial, another lawyer would have to represent petitioners.  When Peter expressed concern about this, Jacob said that he would still be involved and would be directing the progress of the case.  Later in that month, Jacob advised petitioners that Robert W. Hesselbacher, Jr. (Hesselbacher), had been retained as co-counsel and would step in to represent petitioners should Jacob be needed as a witness.  In June 2001, Jacob secured the informed consent of petitioners to continue to represent them, notwithstanding any conflict of interest stemming from his formation of the ESOP.

Following these discussions, Jacob sent a letter to respondent on June 15, 2001, in which he informed respondent that he had obtained his clients' informed consent to obviate any conflict under Rule 24(g)(1) and that Hesselbacher would be entering an appearance as co-counsel to resolve any problems that might arise under Rule 24(g)(3). Jacob stated that the 1993 transaction might be stipulated, thereby removing any need for him to testify, but, in the event he could no longer represent petitioners under Rule 24(g), he would immediately withdraw his appearance. Copies of this letter were sent to Hesselbacher and to petitioners. During 2001, respondent and Jacob exchanged numerous correspondence and discovery documents, all of which were provided to petitioners by Jacob.

In or about June 2001, respondent's counsel contacted their National Office for guidance on how to deal with the Rule 24(g) issues in these cases. The National Office responded that Jacob could continue to represent petitioners, with the understanding that, in the event he was called as a witness, he would withdraw and Hesselbacher would try the case.

On July 17, 2001, Hesselbacher entered his appearance as co-counsel for petitioners. Geoffrey knew that Hesselbacher was representing him. Jacob asked Hesselbacher to become familiar with the cases so that, if the need arose, he could take over as trial counsel. As of July 23, 2001, respondent started

corresponding with Hesselbacher regarding the cases, even sending Hesselbacher an outline of respondent's interpretation of the transactions at issue so Hesselbacher would be familiar with the issues in the case. Sometime in September 2001, Hesselbacher went to Jacob's office and spent time to get familiar with Jacob's voluminous files.

Thereafter, respondent's counsel concluded that Jacob would be a necessary witness at trial, informed Jacob of this fact, and asked Jacob if he would withdraw from the case voluntarily. On September 6, 2001, Jacob sent a letter to respondent in which he again confirmed his intention to withdraw from the cases "when the circumstances warrant"; copies of this letter were sent to petitioners and to Hesselbacher. On September 13, 2001, respondent's counsel, Jacob, and Hesselbacher participated in a conference call with the Court. Respondent's counsel did not advise the Court during this call that Jacob was going to be called as a witness at trial, since respondent's counsel was awaiting the necessary approval from the National Office to file a motion to disqualify Jacob.[5]

On September 17, 2001, the Court set the trial for October 24, 2001, during the Court's Baltimore session. Also on September 17, 2001, Jacob sent a letter to respondent stating

---

[5] Respondent's counsel had recently drafted such a motion and sent it to the National Office with a request for approval to file it with the Court.

that he would withdraw as counsel; copies of this letter were sent to petitioners and to Hesselbacher. On September 19, 2001, Jacob sent another letter to respondent in which he indicated petitioners' desire to settle their cases, but stated again that if settlement could not be reached, he would withdraw.

On September 25, 2001, the Court held another conference call with all counsel. At that time, respondent's counsel informed the Court that Jacob had been involved in planning the transaction, that he was a necessary witness whom they anticipated calling at trial, and that they were preparing to file a motion under Rule 24(g) to disqualify him. The Court indicated that any such motion, if filed, would be heard at the calendar call. On September 25, 2001, following the conference call, respondent and Jacob discussed settling the cases, and respondent faxed to Jacob drafts of a proposed stipulation of settled issues for each of the cases. The next day, Jacob sent a letter to respondent in which he acknowledged receipt of the proposed stipulations of settled issues and requested some changes; copies of this letter were sent to petitioners and to Hesselbacher. Geoffrey received a copy of this letter.

On September 26, 2001, counsel for the parties reached a tentative basis for settlement, of which they informed the Court during a conference call held later that day. Hesselbacher and

Jacob were involved in the settlement negotiations that resulted in the settlement of the cases.

On October 1, 2001, respondent sent a letter to Jacob which enclosed drafts of a proposed stipulation of settled issues for each case. On October 5, 2001, respondent's counsel submitted to the Court a trial memorandum for these cases. That trial memorandum stated that respondent anticipated calling Jacob as a witness and that Jacob, if called, would testify "about how he set up the transaction for petitioners to sell their stock". The trial memorandum also stated as an evidentiary problem:

> Respondent intends to call Arthur Jacob as a witness. Mr. Jacob is petitioners' counsel of record. Mr. Jacob told respondent's counsel that he would file a motion to withdraw as petitioners' counsel. If Mr. Jacob does not file a motion to withdraw, respondent intends to file a motion that the Court disqualify Mr. Jacob as petitioners' counsel under Tax Court Rule 24(g).

As part of a letter dated October 11, 2001, Jacob enclosed a signed stipulation for each case; copies were sent to petitioners and to Hesselbacher. The stipulations of settled issues were executed on behalf of respondent on October 16, 2001, and filed with the Court on October 17, 2001.

In November 2001, Jacob sent several letters to respondent, each of which stated that petitioners' cases had been settled; copies of these letters were sent to petitioners. In December 2001, Jacob sent two letters to respondent which made reference to decision documents to be filed; copies of these two letters

were sent to petitioners. On December 26, 2001, Jacob sent a letter to each petitioner which referenced his case and stated that Jacob had received "the last of the requisite documents from the Internal Revenue Service wrapping up the nine-year mess related to * * * [your] sale of Pennysaver." Petitioners each received a copy of this letter, and both understood from this letter that the cases pending before this Court were being resolved.

On January 28, 2002, Jacob sent a letter to respondent, enclosing executed decision documents for both cases; copies of this letter and the decision documents were sent to petitioners and to Hesselbacher. On February 7, 2002, the Court ordered the parties to file status reports on or before February 21, 2002. Jacob sent a letter dated February 8, 2002, in response to the order in which he advised the Court that he had signed decision documents and returned them to respondent; copies of this letter were sent to petitioners.

On February 21, 2002, the stipulated decisions were entered by the Court. Those decisions found Geoffrey liable for a 1996 tax deficiency of $1,695,600 and related penalties totaling $408,411, together with related interest on both amounts; Peter was found liable for a 1996 tax deficiency of $1,639,157 and related penalties totaling $416,562.25, together with related interest on both amounts.

III. <u>Subsequent Proceedings</u>

On September 9, 2002, petitioners retained another attorney, Mark L. Nowak (Nowak), to represent them with respect to these cases.  In September 2002, Nowak learned about the stipulated decisions that had been entered.  In September 2002, Nowak was not aware of any basis for challenging the underlying tax liabilities as set forth in the decisions.

On or about September 23, 2002, petitioners filed in the Circuit Court of Baltimore County a lawsuit against Jacob (and others), alleging among other things malpractice by Jacob arising in part from the transactions at issue.  Nowak helped prepare the complaint in that lawsuit, and his law firm, Rutherford Mulhall, P.A., represented petitioners.  Petitioners and Jacob reached a basis for settlement in that matter whereby Jacob agreed to pay petitioners a total of $2.9 million.

OPINION

Petitioners request permission to move the Court under Rule 162 to vacate the stipulated final decisions.  That Rule provides that any motion to vacate a decision shall be filed within 30 days after the decision was entered, "unless the Court shall otherwise permit."  Where the taxpayers file such a motion after the Court's decision has become final, our authority to vacate the decision, though limited, may be exercised in situations where the taxpayers establish the existence of a fraud on the

Court.  Cinema '84 v. Commissioner, 122 T.C. 264, 270 (2004).

Fraud on the Court is a fraud which harms the integrity of the

judicial process.  Hazel-Atlas Glass Co. v. Hartford-Empire Co.,

322 U.S. 238, 245 (1944), Standard Oil Co. of California v.

United States, 429 U.S. 17 (1976).  Petitioners bear a heavy

burden of establishing specific facts to show "a convincing case

of palpable fraud on the court".  Kenner v. Commissioner, 387

F.2d 689, 691 (7th Cir. 1968).

Petitioners primarily argue that Jacob and respondent's

counsel committed a fraud on the Court by not appropriately

informing the Court that there were problems under Rule 24(g)(1)

with Jacob's continued representation of petitioners.[6]  According

---

[6] Rule 24(g) provides, in relevant part:

(g) Conflict of Interest:  If any counsel of
record (1) was involved in planning or promoting a
transaction or operating an entity that is connected to
any issue in a case * * * or (3) is a potential witness
in a case, then such counsel must either secure the
informed consent of the client (but only as to items
(1) and (2)); withdraw from the case; or take whatever
other steps are necessary to obviate a conflict of
interest or other violation of the ABA Model Rules of
Professional Conduct, and particularly Rules 1.7, 1.8,
and 3.7 thereof. * * *

This Rule became effective, as Rule 24(f), on July 1, 1990.  It
was subsequently redesignated Rule 24(g) in an amendment which
became effective on Aug. 1, 1998.  When the Court adopted Rule
24(f), the precursor to Rule 24(g), we noted:

Paragraph (f) of Rule 24 is new.  It has been
added because the Court is concerned about the
integrity of its decisions.  All too frequently a

(continued...)

to petitioners, Jacob was the architect of the ESOP and, as such, was precluded by Rule 24(g)(1) from representing them. Petitioners also assert that Jacob was a potential witness who was precluded from representing them by Rule 24(g)(3).

On the basis of the record at hand, we reject petitioners' primary argument. Contrary to petitioners' assertions, the Court was informed on two occasions by respondent as to an issue involving Jacob and Rule 24(g). First, respondent informed the Court on September 25, 2001, that there were problems under Rule 24(g) with Jacob's representation. Second, respondent informed the Court in his pretrial memorandum, filed October 5, 2001, that there were potential problems under Rule 24(g)(1) and (3) with Jacob's representation. As petitioners correctly state, a necessary element of fraud on the Court is the Court's lack of knowledge regarding a material fact so that "damage to the judicial process is sustained." Spence-Parker v. Md. Ins. Group, 937 F. Supp. 551, 562 (E.D. Va. 1996). In Spence-Parker, the plaintiff sued the defendant insurance company, alleging that she was entitled to recover under an insurance policy issued by the defendant to a third party. In a prior action against the third

---

[6](...continued)
disappointed party challenges a decision on the ground that the party's prior counsel had a conflict of interest. Paragraph (f) is designed to insure that the bar of this Court disclose or rectify any conflict of interest. [93 T.C. 858.]

party, counsel for the third party had secretly negotiated a deal with the plaintiff whereby the third party would "settle" the case for $3.5 million and assign its rights to sue the insurance company, in exchange for plaintiff's agreeing to not collect from the third party.  When the plaintiff sued the insurance company and moved for summary judgment, the insurance company moved to set aside the previous judgment on the grounds that the court before which the earlier lawsuit was brought was not informed of the facts underlying the settlement and would not have approved it had the court been so aware.  The court in Spence-Parker agreed, holding that such concealment constituted damage to the judicial system in that the court in the earlier lawsuit would not have approved the settlement had it been fully informed of the facts.  Id.  In contrast to Spence-Parker, the Court did not lack knowledge of a material fact so as to damage the judicial process when it approved the settlement in these cases.

Petitioners argue in the alternative that respondent's and Jacob's overall conduct in these cases constituted fraud on the Court.  We reject this argument.  Petitioners note in their brief that "allegations that one's attorney was grossly negligent or lacked authority are insufficient to demonstrate fraud upon the Court."  Petitioners attempt to circumvent this rule by asserting that Jacob's conduct was deceitful and unethical, primarily on the basis of Jacob's involvement in the cases while under Rule

24(g) conflicts of interest.  We find this attempt unavailing.
On the records at hand, we do not find any violation of Rule
24(g) that rises to the level of fraud on the Court.

A.    Rule 24(g)(1)

Rule 24(g) provides that an attorney's conflict of interest
under Rule 24(g)(1) may be waived by the informed consent of his
or her client.  It is one of our common law's oldest principles
that silence and acquiescence by the client constitutes
ratification and adoption of an agent's actions or
representations.  See, e.g., Feild v. Farrington, 77 U.S. 141,
146 (1870); Lone Star Life Ins. Co. v. Commissioner, T.C. Memo.
1997-465.  The credible evidence in this case establishes that
Jacob kept his clients informed of his actions and that he
advised them regarding his conflict of interest under Rule
24(g)(1).  The credible evidence also establishes, and we have
found as a fact, that both petitioners gave Jacob their informed
consent to continue representing them notwithstanding his
involvement with the ESOP.  Both petitioners recalled discussing
this issue with Jacob, and they were sent copies of all Jacob's
correspondence regarding the cases.  In fact, Jacob even sent
petitioners copies of a letter in which he represented to
respondent that he had obtained their informed consent to
continue with the representation.  While petitioners claim they
never received this letter, we find that claim incredible.

Petitioners admitted to receiving many of the other letters and documents which Jacob sent to them.  Jacob also copied Hesselbacher on all correspondence after he was retained to protect the petitioners interests; Hesselbacher received this correspondence.  Petitioners also admitted that they were aware Jacob might not be able to try the cases due to a conflict of interest and that Jacob had retained Hesselbacher to represent them at trial in the event Jacob could not.

B.     Rule 24(g)(3)

Where an attorney may "potentially be called as a witness", Rule 24(g) requires that the attorney either withdraw or "take whatever other steps are necessary to obviate a conflict of interest or other violation of the ABA Model Rules of Professional Conduct * * * [rule] 3.7".  In contrast to Rule 24(g)(1), Rule 24(g)(3) cannot be satisfied by obtaining the informed consent of the client.

As early as June 2001, respondent and Jacob were aware that Jacob might be called as a witness at trial and made efforts to satisfy Rule 24(g)(3).  Respondent and Jacob exchanged extensive correspondence on the issue, culminating in the retention of Hesselbacher.  Jacob also undertook efforts to stipulate any testimony from him that respondent deemed necessary.  We conclude that Jacob took sufficient steps to "obviate a conflict of

interest or other violation of the ABA Model Rules of Professional Conduct * * * [rule] 3.7".  See Rule 24(g).

_____

We conclude that petitioners have not met their burden of introducing evidence as to specific and credible facts which would lead us to conclude that a fraud was perpetrated which "[subverted] the integrity of the court".  In re Intermagnetics Am., Inc. 926 F.2d 912, 916 (9th Cir. 1991).

In so concluding, we note a split of authority between two Courts of Appeals as to whether prejudice is a necessary element of fraud on the Court.  Compare Dixon v. Commissioner, 316 F.3d 1041, 1046 (9th Cir. 2003), revg. T.C. Memo. 1999-101, with Drobny v. Commissioner, 113 F.3d 670 (7th Cir. 1997), affg. T.C. Memo. 1995-209.  Without deciding that prejudice is an element of proving fraud on the Court, we find that petitioners have not established facts proving prejudice.  On the contrary, petitioners were represented by independent counsel, as well as by Jacob.  We could not find prejudice given the presence of Hesselbacher.  We therefore hold that petitioners have failed to meet their burden of showing a fraud on the Court sufficient to set aside a decision entered over 1½ years before they moved to vacate it.  We have considered all of the arguments of the

parties and have rejected those not discussed herein as meritless.  Accordingly,

An appropriate order will be issued denying petitioners' motion.