**UNITED STATES FIDELITY AND GUARANTY CORPORATION, a Maryland corporation, Plaintiff,**

v.

**MYERS MOTORS, Incorporated, trading as Myers General Tire Service, Riverhill, Martinsville, Virginia, Jesse Thomas Harris, Eliza Hundley, William H. Hundley, Della Marie Perkins, Defendants.**

**Civ. No. 796(R).**

United States District Court
W. D. Virginia, Danville Division.

Sept. 26, 1956.

Eggleston & Holton, Roanoke, Va., for plaintiff.

R. Paul Sanford, Danville, Va., R. Reid Young, Jr., Martinsville, Va., H. L. Fagge, Leaksville, N. C., and Broaddus, Epperly & Broaddus, Martinsville, Va., for defendants.

BARKSDALE, District Judge.

This action having been tried upon the facts by the court without a jury, the court doth hereby find the facts specially and states separately its conclusions of law thereon and directs the entry of the appropriate judgment, as follows:

*Findings of Fact.*

On July 3, 1955, the plaintiff, United States Fidelity and Guaranty Corporation of Maryland, issued to Myers Motors, Inc., of Martinsville, Virginia, an automobile and tire dealer, its public liability garage policy of insurance, which was in full force and effect at all times pertinent to this controversy. One of the provisions of this policy was that the company "* * * agrees * * * to pay on behalf of the Insured all sums which the Insured shall become legally obligated to pay as damages because of bodily injury * * * arising out of * * * the *ownership,* maintenance or use of any automobile in connection with" the operation of Myers Motors, Inc., as an automobile dealer. (Italics mine.) There was also the standard provision extending coverage to persons using insured's automobiles with its permission.

On or about August 22, 1955, defendant, Jesse Thomas Harris, came to the place of business of Myers Motors, Inc.,

and negotiated with Thomas H. Myers, President of Myers Motors, Inc., for the purchase or trade for a 1952 Mercury automobile, which Myers Motors, Inc., had for sale. As to these negotiations, the evidence is somewhat conflicting, but I find as facts that Harris agreed to purchase the 1952 Mercury for the sum of $1,237, of which sum Harris agreed to and did then and there deliver to Myers his 1949 Mercury automobile as a downpayment in the agreed sum of $495, and Harris ageed to pay the balance of $742, in equal monthly instalments. Myers already had the certificate of title for the 1949 Mercury, or it was endorsed and delivered to him by Harris at that time, and about ten days later Myers sold the 1949 Mercury to an employee of Harris. At the conclusion of the negotiations, the 1952 Mercury was delivered by Myers to Harris, who took possession of it, drove it home, and continued to use it until it was involved in a wreck on August 27, 1955. The only detail of the transaction left unsettled was the matter of financing the deferred payments of the purchase price by Harris. Myers desired that the transaction be financed by a finance company, but he did not think that the companies with which he did business would finance the transaction. It was agreed that Harris would undertake to have the transaction financed, but this was not accomplished. In the event that Harris could not make arrangements with a finance company for financing the transaction, it was Myers' purpose to accept the note of Harris for the deferred payments and undertake to collect them himself. Before leaving with the 1952 Mercury, Harris signed in blank a contract and note. The contract was in the form of a lease, but actually it was a conditional sales agreement. Later in the week, and before the wreck on September 27, 1955, Myers had his bookkeeper fill out the contract and note providing for the payment of the balance of the purchase price of the 1952 Mercury in equal monthly instalments.

Although Myers had in his possession the certificate of title of the 1952 Mercury, which had been endorsed to Myers Motors, Inc., by the person from whom it had been acquired, the certificate of title was not delivered to Harris, nor was it assigned to him, as required by Virginia law, at that time or any time thereafter.

On September 27, 1955, while operating the 1952 Mercury in Henry County, Virginia, defendant, Harris, was involved in a collision with another automobile in which the defendants, Eliza Hundley, William H. Hundley and Della Marie Perkins sustained personal injuries. These three defendants have instituted separate damage suits against defendant Harris for personal injuries sustained by them in this collision in the Circuit Court of Henry County, Virginia, which suits are now pending.

Since the collision, the 1952 Mercury has not been repaired, but Harris has treated it as his property and has paid in instalments to Myers approximately $270 on account of the balance of the purchase price of this automobile.

Upon being advised that he should report the accident to his insurance company, Myers, on November 10, 1955, notified the agent of the plaintiff, from whom he had procured the policy, of the accident, and procured from this agency a form of "Notice of Policy under the Virginia Motor Vehicle Safety Responsibility Act [Code 1950, § 46–386 et seq.]", which was filled out by Myers and plaintiff's agent, and forwarded to the Division of Motor Vehicles of Virginia. This notice gives the date and place of the accident, the model, make and motor number of the 1952 Mercury, and recites that it was operated by Jesse Thomas Harris, and owned by Myers General Tire Service (a trade name of Myers Motors, Inc.), that the policy contained standard provisions, was in effect on the date of the accident, and that it applied to the above owner and the above operator.

The necessary diversity of citizenship and jurisdictional amount are present.

Conclusions of Law.

Plaintiff, United States Fidelity and Guaranty Company, has instituted this declaratory judgment action, seeking adjudication that its policy of insurance does not cover the claims asserted against defendant, Jesse Thomas Harris, by defendants, Eliza Hundley, William H. Hundley and Della Marie Perkins, in the suits instituted by them in the state court and now pending. The question involved is, of course, whether or not the causes of action of these three defendants arose out of "the ownership, maintenance or use" of the 1952 Mercury in connection with the operation of the insured, Myers Motors, Inc., as an automobile dealer. Plaintiff contends that prior to the date of the collision a completed sale of the 1952 Mercury by Myers to Harris had taken place, and that all "ownership" had passed from Myers Motors, Inc., to Harris. Defendants contend that the evidence shows that Harris was merely trying out the 1952 Mercury and had not yet finally agreed either to purchase it or on the terms of the purchase. Defendants further contend that, even on the facts as I have found them, under Virginia law, which of course governs, Myers Motors, Inc., the insured, retained ownership by reason of the fact that it had not transferred or taken any steps to transfer, the certificate of title as required by Virginia law. Code of Virginia 1950, § 46–84 et seq.

Upon the facts found, it is my conclusion that, but for the certificate of title law, the transactions between Harris and Myers constituted a completed sale and all ownership of the 1952 Mercury would have passed from Myers Motors, Inc., to Harris. However, under the Virginia certificate of title law, before the legal title to an automobile can be transferred in Virginia, the owner is required to endorse an assignment and warranty of title upon the reverse side of the certificate of title and deliver it to the purchaser at the time of delivery of the vehicle. Section 46–84. Section 46–85 requires the purchaser to immediately forward the certificate, so endorsed, to the Division of Motor Vehicles, and it is made a penal offense not to comply with these requirements.

Shortly after its enactment, the certificate of title law, in its application to a situation substantially similar to the one here under consideration, came before the Supreme Court of Appeals of Virginia for construction in Thomas v. Mullins, 153 Va. 383, 149 S.E. 494, 497. Noting that the certificate of title law "is essentially a police regulation, enacted primarily for the protection of the public, and its provisions are mandatory in their terms", the court held that the certificate of title law, not having been complied with, " * * * then the contract of sale was merely executory and not executed * * * ".

It must be conceded that, if the transaction here under consideration was merely an executory contract of sale, then "ownership" of the 1952 Mercury automobile remained in Myers Motors, Inc., the insured.

Sauls v. Thomas Andrews & Co., 163 Va. 407, 175 S.E. 760, followed Thomas v. Mullins, supra. In United States v. One Hudson Hornet Sedan, D.C., 110 F. Supp. 41, this court applied the doctrine of Thomas v. Mullins to a situation substantially similar to the situation here presented.

Plaintiff relies on Federated Mutual Implement & Hardware Insurance Co. v. Rouse, D.C., 133 F.Supp. 226, an Iowa case, and Switzer v. Merchants Mutual Casualty Co., 1 A.D.2d 737, 146 N.Y.S.2d 855, a New York case. While these cases tend to support plaintiff's contention, they are not entirely analogous, are not decisions of courts of last resort, deal with statutes of other states, and are not particularly helpful in the consideration of the Virginia statute. Silvey v. Johnston, 193 Va. 677, 70 S.E.2d 280, cited by plaintiff, does not seem to me to be in point here.

Plaintiff also relies on Janney v. Bell, 4 Cir., 111 F.2d 103, 107, which holds that under the Virginia certificate of title law, a chattel mortgage, although un-

registered, is good between the parties. However, in discussing the effect of the Virginia statute, Judge Dobie in his opinion, 111 F.2d at page 107, clearly draws a distinction between the decision in the Janney case and the doctrine of Thomas v. Mullins. He said:

"\* \* \* We believe that a clear distinction can properly be made between sales of motor vehicles, when title (or ownership or general property) is supposed to pass between the parties to the transaction, and other claims or liens less than title or ownership. It might well be that these recordation provisions are mandatory as to sales of motor vehicles in that they are designed for three very definite purposes: (1) To suppress automobile thefts; (2) to provide the state with a convenient and accessible record of title for tax purposes; (3) to provide a convenient and accessible method of identifying the ownership of an automobile for police purposes in connection with its operation on the highways of the state. These three reasons for attaching hard, deterrent results to any failure to comply with recordation statutes in connection with automobiles, do not exist as to liens or other claims less than title. Normally, one who has beneficial title to an automobile would be the one who would operate it on the highway, would pay the taxes and would be most concerned in preventing a theft of the car. The criminal sanctions under the Virginia Motor Vehicle Act, we think, were enacted primarily with reference to those having complete ownership, or at least beneficial title, as distinguished from security title or any lesser measure of interest in the automobile."

Finally, plaintiff cites a decision of this court, Maryland Casualty Co. v. Powers, D.C., 113 F.Supp. 126. However, this decision does not support plaintiff's contention. In the Powers case, a father made a complete gift of an automobile to his son, but did not transfer the certificate of title to the son because he was an infant. After the son had taken complete possession of the automobile, the father procured a public liability insurance policy upon the automobile and warranted that he was its *"sole owner"*. In a declaratory judgment action instituted by the insurance company to determine whether the policy covered liability for the claims of persons injured by the son in the operation of the automobile, this court held that there was no coverage by reason of the fact that the declaration of the father that he was the "sole owner" of the automobile was untrue and material to the risk, rendering the policy void or voidable at the option of the company. That was far different from holding that the son was the "sole owner".

To me, the conclusion seems inescapable that the doctrine of Thomas v. Mullins, supra, controls the decision of this case. Undoubtedly, Harris, as the vendee in an executory contract of sale, acquired some rights, but it is my conclusion that, as the certificate of title law was not complied with, the legal title to the automobile in question remained in Myers Motors, Inc. That being true, its "ownership" remained in Myers Motors, Inc., the insured, subject only to such rights as Harris might have as vendee in an executory contract of sale.

It follows that a judgment will be entered declaring that the policy of insurance here in controversy covers any liability which may result from the collision in which Harris was involved on September 27, 1955.