HARDWARE MUTUAL CASUALTY
COMPANY, Appellant,

v.

Bewayne JONES and Louis Jones,
Appellees.

No. 9032.

United States Court of Appeals
Fourth Circuit.

Argued Oct. 1, 1963.

Decided April 21, 1964.

Preston P. Taylor, Norfolk, Va., and E. Ballard Baker, Richmond, Va. (Robert M. Furniss, Jr., Norfolk, Va., on brief), for appellant.

J. Randolph Davis, Norfolk, Va. (Wilson L. Rivers, and Davis, Boyd & Bea-

man, Norfolk, Va., on brief), for appellees.

Before HAYNSWORTH and BOREMAN, Circuit Judges, and R. DORSEY WATKINS, District Judge.

HAYNSWORTH, Circuit Judge.

Because the jury received less guidance from the Court than was needed to enable it to resolve the factual issues submitted to it, we conclude that a new trial is appropriate.

The question generally relates to the coverage of an automobile dealer's liability insurance policy on an automobile used by one of the dealer's employees, and the principal factual issue was whether or not the use was with the permission of the dealer. Some reference to the particular facts is required.

Automoville, Inc. and a partnership doing business as Phillips Bros. Automoville were the named insureds in an automobile garage liability policy issued by Hardware Mutual Casualty Company. The policy afforded coverage for legal liabilities arising out of the automobile and garage business operated by the insureds and out of the use of automobiles used principally in the automobile and garage business of the named insureds.

In August 1960 Phillips Bros. Automoville acquired in a trade a 1947 Pontiac, the title to which it transferred to Automoville, Inc. Elbert L. Heckstall was an employee in the garage of Automoville, Inc., and he wanted to buy the Pontiac. Tench H. Phillips, Jr., an official of the company, agreed to sell the Pontiac to Heckstall for a price somewhere between $50 and $100. The parties were uncertain as to the exact amount of the purchase price agreed upon. Heckstall, however, paid $20 on account of the purchase price at the time of the agreement in August 1960, and agreed to pay the remainder in weekly or monthly instalments. It was understood that the purchase price would be paid in full before the automobile was transferred to him and, meanwhile, it was not to be delivered to him.

Some three weeks later, however, Heckstall sought permission to take the Pontiac to his home for the purpose of working upon it after hours and during his days off. Phillips gave him permission to do that and lent him some dealer's tags for use on the automobile as he drove it from the garage to his home. Heckstall then returned the tags to Automoville, Inc.

Some nine months later, the agreed purchase price, whatever it was, had still not been paid in full and the automobile remained in Heckstall's possession. Both Heckstall and Phillips testified positively, however, that Heckstall was instructed by Phillips not to use or drive the automobile, except that, on one or two occasions during the 9-month period, Heckstall sought and obtained Phillips' permission to drive the automobile on a specified mission, and, on those occasions, Phillips allowed Heckstall to use a set of his dealer's license plates, which Heckstall returned on each occasion.

There was testimony from others, however, that they had seen Heckstall driving the Pontiac automobile on ten or fifteen occasions, each time with dealer's tags on the automobile. Heckstall denied that he had used the automobile except on those one or two occasions when he had the express permission of Phillips.

On June 17, 1961, Heckstall was not working. He had injured his leg sometime before and he wanted to go to a hospital for treatment of his leg. Later that afternoon he went to the used car lot of Automoville. Robert Womack and possibly other salesmen were there. Phillips was out of town. Womack was engaged with a prospective customer when Heckstall made known to him his desire for some dealer's tags, and Womack, without speaking, pointed to where they were. Heckstall took the tags to his home, put them on the Pontiac, and, with several passengers, started for the hospital. En route he was involved in an accident which resulted in injuries to Bewayne Jones.

Sometime later, Automoville sold the Pontiac to someone else and refunded to Heckstall the $20 he had paid toward its purchase price.

Thereafter, Hardware Mutual Casualty Company brought this action against Bewayne Jones and his father seeking a declaratory judgment as to its duties and liabilities arising out of its insurance of Phillips Bros. Automoville and Automoville, Inc.

The District Court submitted to the jury a single interrogatory:

"Was the 1947 Pontiac automobile in question, at the time of the accident and injury to Bewayne Jones, being used by Elbert L. Heckstall with the consent, express or implied, of Automoville, Inc.?"

The jury answered "Yes," and the District Court entered judgment for the defendants.

The Court's instructions to the jury in relevant part were as follows:

"Now in determining this one question in this particular case, you are to consider all of the evidence that you heard from the witness stand. You should take into consideration when and how this Pontiac automobile was acquired; under what circumstances it was acquired; whether there was any limitations upon its use and if so, what were those limitations and what was the purpose of giving the possession of the automobile to the young man in question and from all of the situations, from all of the overall transactions taking into consideration the time involved and how the automobile came back and everything that you had heard, determine whether or not from all of that evidence and as I have told you, you are the sole judges of the credibility and the weight to be given to the testimony of the various witnesses but from your evaluation of it all, determine whether or not this boy—Elbert Heckstall did have either the expressed or implied consent to use that automobile at the time he was using it.

\*　　\*　　\*　　\*　　\*　　\*

"Implied consent—I mean you determine that from evaluation of all of the surrounding facts and from those facts determine whether or not in your opinion from the mere acceptance of the fact, that you have after you find them to be facts, whether or not he had that consent either expressed or implied."

The jury was at liberty to disregard the testimony of Phillips and Heckstall about the restriction placed upon Heckstall's use of the automobile. If they rejected that testimony, the jury could have found from Heckstall's possession of the automobile, particularly if it also found it was frequently used by Heckstall, a general consent on the part of Automoville, Inc. for his use of the vehicle as if it were his. In that event, except for the length of the time involved, the case would have been cast in the posture of the usual case where the purchaser, under an executory contract, uses the vehicle with consent of the dealer before the transaction is executed.

When a dealer permits a prospective purchaser to try out one of the dealer's automobiles, the automobile beyond question is being used in the dealer's business within the meaning of a dealer's and garage keeper's liability insurance policy. If an executory contract of sale is reached and the dealer permits the purchaser to continue to use the vehicle until the sale can be closed and the final papers executed and delivered, the vehicle is still being used in the dealer's business in the same sense in which it was before the executory contract was concluded, for such use is in aid of the sale and appropriate to the promotion of the dealer's business and his good will. It is thus held in Virginia, in those circumstances, that the seller's insurance is applicable and the executory purchaser is an additional insured under the omnibus clause of the seller's insurance. United States Fidel-

ity and Guaranty Corporation v. Myers Motors, W.D.Va., 143 F.Supp. 96; Nationwide Insurance Company v. Storm, 200 Va. 526, 106 S.E.2d 588.

The difficulty here is that as the case was submitted to the jury there is no way to tell whether or not the jury found this to be such a case. The principle was not explained to them and they could have answered the one interrogatory as they did though firmly convinced that Heckstall had no general permission to use the automobile. Their answer could have been founded solely upon what occurred between Heckstall and Womack on June 17. In that event, of course, there would be a substantial question of coverage. If there was no general permission to Heckstall to use the automobile, if it was generally retired from all use, its use on one occasion with the express consent of the dealer, but on the personal mission of the driver unrelated to the dealer's business, might well require a conclusion that it was not used principally in the operation of the dealer's business within the meaning of the insuring clause.[1]

■■ It is possible also that the jury may have found that Heckstall's use of the vehicle was originally restricted, as he and Phillips testified, but inferred a general consent to its use from the fact that thereafter Phillips admittedly authorized its use by Heckstall on one or two occasions. If the jury indulged in such an inference, it may well have been contrary to the principle, recognized in Virginia, that permission to use the automobile for one purpose did not carry with it permission to use it for other unrelated purposes.[2] The jury was not told of the

principle and its deliberations were unfettered by its restraint.

Finally, the jury's finding of consent may have depended upon what the salesman, Womack, did on June 17, 1961. His pointing, however, in the direction of the dealer's tags was certainly equivocal when he had not interrupted his conversation with his prospective customer to inquire the purpose for which Heckstall wished them. The jury may well have believed that Womack understood and intended to authorize Heckstall to use the dealer's tags on the Pontiac automobile in furtherance of his personal convenience, and that Womack had apparent authority to authorize Heckstall to use the Pontiac, but there were no instructions which would guide the jury in determining whether or not Womack had such apparent authority or in drawing reasonable inferences from his conduct in pointing to the tags.

It thus appears that the jury could have answered the interrogatory as it did on the basis of subsidiary findings or conclusions which would raise substantial legal questions as to the coverage and applicability of the insurance. When the jury was told nothing of the relevant legal principles, there is no way to determine whether the jury employed erroneous standards or whether or not the entry of judgment upon the answer to the one interrogatory was appropriate. In short, there are questions which cannot be answered by the jury's verdict in light of the submission of the issue to it.

Under these circumstances, the judgment will be reversed and the case remanded for a new trial.

Reversed and remanded.

1. See Hardware Mut. Casualty Co. v. Wendlinger, 4 Cir., 146 F.2d 984; Employers Mut. Cas. Co. of Des Moines, Iowa v. Federated Mut. Implement & Hardware Ins. Co., 8 Cir., 213 F.2d 421; Barrett v. Employers' Liability Assur. Corporation, 5 Cir., 118 F.2d 799; Farm Bureau Mut. Automobile Ins. Co. v. Daniel, 4 Cir., 104 F.2d 477; Hartford Accident & Indemnity Company v. Casualty Underwriters, D.C.Minn., 130 F.Supp. 56; Royal Indemnity Insurance Company v.

Shue, Ind.App., 182 N.E.2d 796; Pacific Auto Insurance Co. v. Lewis, 56 Cal. App.2d 597, 132 P.2d 846; Commercial Standard v. Sanders, Tex.Civ.App., 326 S.W.2d 298.

2. Aetna Casualty & Surety Company v. Anderson, 200 Va. 385, 105 S.E.2d 869; Fidelity & Casualty Co. of New York v. Harlow, 191 Va. 64, 59 S.E.2d 872; Williams v. Travelers Insurance Company, 4 Cir., 265 F.2d 531.