**Scott FIELD, Chapter 7 Trustee for Estate of Russell Edger Dangerfield, Plaintiff,**

v.

**TRANSCONTINENTAL INSURANCE CO., Defendant.**

**CIV.A. No. 97–702–A.**

United States District Court, E.D. Virginia, Alexandria Division.

March 18, 1998.

Lynn Perry Parker, John R. Garza, Garza, Regan & Rose, P.C., Rockville, MD, Scott Field, Chapter 7 Trustee, Reznick, Fedder & Silverman, Bethesda, MD, for Plaintiff.

Stephen A. Horvath, Trichilo, Bancroft, McGavin, Horvath & Judkins, P.C., Fairfax, VA, for Defendant.

## MEMORANDUM OPINION

ELLIS, District Judge.

In this diversity action, a trustee in bankruptcy claims that his debtor was an insured under a policy of insurance and that the insurer's bad faith refusal to defend and indemnify the debtor-insured caused damage to the debtor. The parties have filed cross-motions for summary judgment, which motions have been fully briefed and argued and are thus now ready for disposition.

## I

On October 31, 1995, Malek Manesh was traveling southbound on Route 355 in Rockville, Maryland. At the same time, Russell Dangerfield was driving a Ford Bronco northbound, but in the southbound lane and on the wrong side of the median. Allegedly under the influence of drugs or alcohol, Dangerfield continued to operate his vehicle northbound in the southbound lane, causing a collision with several cars, including Manesh's. As a result, Manesh suffered serious bodily injuries and her vehicle was severely damaged.

Dangerfield had obtained the Bronco under a conditional sales contract with HBL Mercedes ("HBL") ten days earlier pursuant to a "spot delivery," which entitled Dangerfield to use the car while he sought financing to purchase it. At the time of the crash, HBL was insured by defendant Transcontinental Insurance Co. ("Transcontinental") under a garage policy.[1] The policy provided that anyone who used a vehicle covered by the policy with HBL's permission was covered by the policy, unless that person was an HBL customer. The policy further provided, however, that in the event an HBL customer did not have his or her own insurance, that customer *would* be covered under the Transcontinental garage policy. At the time of the crash that is the subject of this suit, Dangerfield did not have auto insurance, although he had indicated to the contrary on the sale agreement.

Manesh and her husband, Mohamman Emdadi, filed a personal injury action against Dangerfield,[2] HBL, and Manesh's insurance carrier, Allstate Insurance Co., in Montgomery County, Maryland. All parties except Dangerfield were dismissed from the Maryland suit. Transcontinental refused to defend Dangerfield, to indemnify him, or to settle the claims against him. Dangerfield did not appear at the trial,[3] and a default judgment was entered against him in the amount of $1,200,124.80. This judgment has yet to be satisfied.

1. A "garage policy" is a standard liability policy that insures an automobile dealer against claims arising out of the ownership of any automobile in its dealership. The relevant policy here was issued to Lantzsch–Andreas Enterprises, Inc., d/b/a HBL, Inc.

2. On March 1, 1996, after the Maryland complaint was filed, but prior to service of it on him, Dangerfield filed a Chapter 7 petition. At the request of Manesh and her husband, the Bankruptcy Court lifted the automatic stay and allowed the litigation against Dangerfield to proceed.

3. Dangerfield was incarcerated at the time. Neither Dangerfield nor the trustee has attacked the validity of the default judgment on this ground. *See, e.g., Klapprott v. United States*, 335 U.S. 601, 69 S.Ct. 384, 93 L.Ed. 266 (1949) (vacating default judgment, pursuant to Rule 60(b)(6), Fed. R.Civ.P., because defendant's incarceration and other circumstances prevented him from adequately responding to the claims against him).

The present action is brought by the trustee of Dangerfield's bankrupt estate against Transcontinental. Plaintiff-trustee claims that Transcontinental acted in bad faith when it (i) denied Dangerfield coverage under the HBL policy and as required by Va.Code § 38.2–2205(A); (ii) refused to defend Dangerfield; and (iii) refused to settle the claims against him.[4] Plaintiff also claims, apparently on a third-party-beneficiary theory, that Transcontinental breached its contract of insurance with HBL.

## II

Four questions are presented on summary judgment. The first and potentially dispositive question is whether this bad faith action belongs to Dangerfield's bankruptcy estate or to Dangerfield individually. Only if the claim belongs to the estate may this action proceed. Assuming the trustee may bring this claim on behalf of the estate, the second question is whether Dangerfield was the "owner" of the Bronco at the time of the accident. If so, then he was not Transcontinental's insured and thus the matter would end because Transcontinental would then have owed Dangerfield no contractual duties. But if Dangerfield was not the "owner," then he was Transcontinental's insured to whom Transcontinental owed contractual duties. In this event, a third question must be resolved, namely whether Transcontinental's refusal to defend and indemnify Dangerfield was in bad faith. The fourth and closely related question is whether Dangerfield suffered any injury as a result of Transcontinental's alleged bad faith conduct.

### A. Ownership of the Claim

■ Transcontinental claims that plaintiff, as trustee of debtor's bankrupt estate, does not have the right to bring the instant bad faith cause of action because the action does not belong to the estate, but instead belongs to Dangerfield individually. Analysis of this claim properly begins with the statutory definition of the bankrupt's estate as including "all legal or equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. § 541(a)(1). This definition encompasses causes of action that the debtor has against his creditors. See Tignor v. Parkinson (In re Tignor), 729 F.2d 977, 981 (4th Cir.1984) ("The debtor's claims for injuries to the person, [including those that are] unliquidated as when the petition was filed ... are thus property of the bankrupt estate as of the commencement of the case."). A threshold question, then, is whether Dangerfield had a cause of action against Transcontinental on March 1, 1996, the date the petition was filed. In the circumstances, this question is not easily resolved given that although Transcontinental received notice of the claim against Dangerfield two months prior to the filing of the petition, Dangerfield did not request indemnification until October 29, 1996, some eight months after he filed his petition. Thus, Transcontinental claims that a cause of action against it for bad faith refusal to indemnify did not accrue until that request was explicitly denied in writing on November 6, 1996.[5] A second possibility, also not easily resolved, is that even if the bad faith cause of action had not yet accrued by the time of the filing of the petition in March 1996, Dangerfield, at the time, could nonetheless have brought a declaratory judg-

4. It is worth nothing that in Virginia an action for an insurer's bad faith sounds in contract, not tort. See Bettius & Sanderson, P.C. v. National Union Fire Ins. Co., 839 F.2d 1009, 1015 (4th Cir.1988) (stating that fiduciary duty insurer owes insured is "imposed by the contract of insurance [and has] no other source"); A & E Supply Co. v. Nationwide Mut. Fire Ins. Co., 798 F.2d 669, 676 (4th Cir.1986) ("liability for bad faith conduct is a matter of contract rather than tort law"); Aetna Cas. & Sur. Co. v. Price, 206 Va. 749, 146 S.E.2d 220, 228 (1966).

5. Transcontinental further contends that, even if a denial of a defense and coverage occurred in January 1996, when the Manesh action commenced, Dangerfield was not harmed by Transcontinental's failure to indemnify, defend, and settle until February 1997, when the adverse judgment in that action was entered against him. Only then, claims Transcontinental, did a cause of action arise. See Sides v. Richard Mach. Works, Inc., 406 F.2d 445, 446 (4th Cir.1969) (holding that a right to relief arises only when there is "harm to the claimant as a proximate consequence of the breach"). Plaintiff responds that the filing of the Manesh action itself was sufficient to cause Dangerfield harm, as it was the commencement of that action that forced him to file for bankruptcy.

ment action against Transcontinental for a coverage determination. Not surprisingly, Transcontinental claims that this possibility is foreclosed by settled principles precluding a declaratory judgment action in the absence of an "actual" or "justiciable" controversy.[6] Transcontinental argues that until it actually denied Dangerfield coverage, there was no antagonistic assertion of rights between the parties, and thus no actual controversy. In short, whether Dangerfield had a ripe, viable bad faith or declaratory judgment action at the time of the petition is a difficult question as to which there is no controlling precedent.

 As it happens, however, it is unnecessary to resolve the difficult question whether Dangerfield had a prepetition cause of action, either for bad faith refusal to defend, indemnify, and settle, or for a declaratory judgment regarding coverage. This is so because the bankrupt's estate includes not only claims that had accrued and were ripe at the time the petition was filed, but also those claims that accrued postpetition, but that are "sufficiently rooted in the pre-bankruptcy past." *Segal v. Rochelle*, 382 U.S.

375, 380, 86 S.Ct. 511, 515, 15 L.Ed.2d 428 (1966) (setting forth test for what claims become part of the estate pursuant to § 541(a)(1)).[7] In the instant case, Dangerfield's right to coverage is certainly "rooted in the prebankruptcy past": the accident occurred on October 31, 1995, four months before he filed his petition, and this is when his right to coverage arose. That Dangerfield did not then request coverage is irrelevant, for, on the date of the accident, he had a contingent right of coverage under HBL's policy. *See Segal*, 382 U.S. at 379, 86 S.Ct. at 515 ("[T]he term 'property' has been construed most generously and an interest is not outside its reach because it is novel or contingent or because enjoyment must be postponed.").[8] Accordingly, because the bad faith claim is "sufficiently rooted in [Dangerfield's] pre-bankruptcy past," it is part of the debtor's estate and may be asserted by the trustee. And this is so regardless of whether either a declaratory judgment or bad faith cause of action existed on March 1, 1996. In short, the bad faith action is now part of the debtor's estate, and thus the trustee may bring this action on the estate's behalf.[9]

6. *See* Va.Code § 8.01–184 (providing that before declaratory judgment action can be brought, there must be an "actual controversy"); *Reisen v. Aetna Life & Cas. Co.*, 225 Va. 327, 302 S.E.2d 529, 531 (1983) (stating that controversy must be justiciable, i.e., claim must be based on present rather than future or speculative facts).

7. Though a pre-Code case, *Segal* has been adopted by many courts since the revision of the Bankruptcy Code in 1978. *See, e.g., In re Doemling*, 127 B.R. 954, 956 (W.D.Pa.1991). The full *Segal* test requires that, before property is included in the estate, it be "sufficiently rooted in the pre-bankruptcy past and so little entangled with the bankrupts' ability to make an unencumbered fresh start" that deeming the res "property" is warranted. *Segal*, 382 U.S. at 380, 86 S.Ct. at 515. The second prong of this test, were it still controlling, would present an insurmountable hurdle for Dangerfield (and thus for the trustee), for Dangerfield's ability to make a fresh start is inextricably tied to his ability to recover from Transcontinental. If he does not recover, he will emerge from bankruptcy still owing a $1.2 million judgment. Thus it cannot be said that the instant cause of action is "little entangled with the bankrupt['s] ability to make an unencumbered fresh start." But this is not fatal to the trustee's claim here, for, to extend the metaphor, it does not matter if the hurdle is insurmountable if it has been removed from the track. In this regard, the Ninth Circuit reexamined *Segal* in

light of the 1978 revision of the Bankruptcy Code and held that the "Code follows *Segal* insofar as it includes [in the estate] after-acquired property 'sufficiently rooted in the prebankruptcy past' but [it] *eliminates the requirement that [the claim] not be entangled with the debtor's ability to make a fresh start." In re Ryerson*, 739 F.2d 1423, 1426 (9th Cir.1984) (citing legislative history of the 1978 Act) (emphasis added). Thus, a bankruptcy trustee need only satisfy the first prong of *Segal* in order to sweep a claim into the debtor's estate.

8. For other cases holding that contingent interests constitute property under § 541(a)(1), see *In re Ryerson*, 739 F.2d at 1425; *Kloos v. Dias (In re Dias)*, 37 B.R. 584, 586–87 (Bankr.D.Idaho 1984); *Turner v. Burton (In re Turner)*, 29 B.R. 628, 631 (Bankr.D.Me.1983).

9. This result is not altered simply because the full harm caused by the refusal to indemnify was not felt until the Maryland judgment was entered a year after Dangerfield filed for bankruptcy. Even when a debtor's claim is grounded in prepetition circumstances, his estate can recover for injury occurring postpetition. *Cf.* 5 *Collier on Bankruptcy* ¶ 541.08, at 541–42 (Lawrence P. King ed., 1997) ("[T]he debtor's entire interest in a prepetition personal injury claim becomes property of the estate. This includes the debtor's rights to recover for postpetition pain and suffering.").

■ An alternate basis for allowing the trustee to pursue this action is the fact that the policy, and thus the rights created by it, existed prior to the filing of the bankruptcy petition. As such, any rights Dangerfield had pursuant to that policy became property of the estate upon the filing of the Chapter 7 petition. *See A.H. Robins Co. v. Piccinin,* 788 F.2d 994, 1001 (4th Cir.1986) (noting that insurance contracts held by the debtor are included in the term "property," as that term is used in § 541(a)(1)).[10] Indeed, as acknowledged by the Fourth Circuit, in some cases the policy and its attendant rights "may be the most important asset of [the] estate." *A.H. Robins,* 788 F.2d at 1001 (quoting *Johns–Manville Corp. v. Asbestos Litigation Group (In re Johns–Manville Corp.),* 40 B.R. 219, 229 (S.D.N.Y.1984)). Because the estate now owns the rights afforded Dangerfield by the HBL garage policy, the trustee may bring the instant action to enforce those rights.

### B. *Ownership of the Bronco*

Given that the trustee is the proper plaintiff here, the next question is whether the policy on which he sues in fact provided coverage to Dangerfield at the time of the accident. The search for this question's answer, of course, must begin with the operative language of the HBL policy, which provides as follows:

1. For covered autos

a. You [HBL] are an insured for any covered auto

b. Anyone else is an insured while using with your permission a covered auto except:

(3) Your customers .... However, if a customer of yours:

(a) Has no other available insurance ... he or she is an insured but only up to the compulsory or financial re-

sponsibility law limits where the covered auto is principally garaged.

This or similar language, often referred to as the "omnibus clause," must be included in every auto insurance contract in Virginia. *See* Va.Code §§ 38.2–2205(A); *see also Bernstein v. Nationwide Mut. Ins. Co.,* 458 F.2d 506, 508 (4th Cir.1972) (finding that this statute creates coverage for any permissive user of a covered vehicle). In essence, the Transcontinental policy provides coverage to Dangerfield if (i) the Bronco was a "covered auto" and (ii) Dangerfield did not have his own insurance.

■ The threshold question in determining coverage is who owned the Bronco: if HBL owned it, then it was a covered auto; if Dangerfield owned it, it was not.[11] Fourth Circuit and Supreme Court of Virginia precedent clearly establish that, although Dangerfield was in possession of the Bronco, and although he had signed a conditional sales contract for the vehicle, the Bronco was still owned by HBL, at least for coverage purposes, and thus Dangerfield was covered under the policy. Particularly instructive in this regard is *Hardware Mutual Casualty Co. v. Jones,* 330 F.2d 1014 (4th Cir.1964), in which the Fourth Circuit stated that

[w]hen a dealer permits a prospective purchaser to try out one of the dealer's automobiles, the automobile beyond question is being used in the dealer's business within the meaning of a dealer's and garage keeper's liability insurance policy. If an executory contract of sale is reached and the dealer permits the purchaser to continue to use the vehicle until the sale can be closed and the final papers executed and delivered, the vehicle is still being used in the dealer's business in the same sense in which it was before the executory contract was concluded, for such use is in aid of the sale and appropriate to the promotion of

---

**10.** There is a subtle difference between this argument and the argument above regarding the existence vel non of a prepetition cause of action. The latter argument focuses on whether there was a cause of action, arising out of the insurance policy, that constituted property of the estate under § 541(a)(1); the instant discussion, by contrast, focuses on the fact that the insurance policy itself is property of the bankrupt's estate.

**11.** The policy at issue covers injury "resulting from garage operations." And the policy provides that the term "'[g]arage operations' includes the ownership ... of the autos indicated" in the declarations. Thus, if HBL owns an auto that is listed in the declarations, that auto is covered by the garage policy.

the dealer's business and his good will. It is thus held in Virginia, in those circumstances, that the seller's insurance is applicable and *the executory purchaser is an additional insured under the omnibus clause of the seller's insurance.*

330 F.2d at 1016 (emphasis added). Similarly, in *U.S. Fidelity & Guaranty v. Myers Motors,* 143 F.Supp. 96 (W.D.Va.1956), the district court on facts essentially identical to those at bar held that the dealer still owned the car because title had not yet passed to the buyer. *See* 143 F.Supp. at 98; *see also Nationwide Ins. Co. v. Storm,* 200 Va. 526, 106 S.E.2d 588 (1959) (holding that buyer who paid purchase price and took possession of vehicle was covered by seller's insurance because certificate of title had yet to pass).[12] This last factor is crucial to the question of ownership because "Virginia has been viewed as a strict title state with respect to the passage of ownership interests in automobiles." *Rawl's Auto Auction Sales, Inc. v. Dick Herriman Ford, Inc.,* 690 F.2d 422, 427 (4th Cir.1982). Because title to the Bronco never passed to Dangerfield, HBL remained the owner of the vehicle and thus Dangerfield remained an insured under HBL's policy.

In an attempt to avoid this conclusion, Transcontinental points to the definition of an "owner" of an automobile in Virginia's Motor Vehicles code, which it argues mandates a finding that Dangerfield *was* the owner of the Bronco for coverage purposes. This definition provides as follows:

> "Owner" means a person who holds the legal title to a vehicle; however, if a vehicle is the subject of an agreement for its conditional sale ... with the right of purchase on performance of the conditions stated in the agreement and with an immediate right of possession vested in the conditional vendee ... then the conditional vendee ... shall be the owner for the purpose of this title.

Va.Code § 46.2–100. Dangerfield did not hold legal title to the Bronco. But he did have a conditional sales contract for the Bronco, under which he was to receive a right of possession once he obtained financing for the car. Under the terms of § 46.2–100, then, it appears that Dangerfield would be the "owner" of the Bronco for purposes of the Motor Vehicles title.

Interestingly, none of the cases cited above, which hold that a purchaser who does not have the certificate of title is not the owner of the vehicle, cites § 46.2–100, which appears to be to the contrary, as it provides that one who does not have the certificate of title but who has signed a conditional sales contract *is* an owner. The apparent discrepancy can be explained with reference to the two sources of law at issue here. The Virginia Motor Vehicles code provides that a vendee who has a conditional sales contract is an owner "for the purpose of this title." Va.Code § 46.2–100; *see id.* ¶ 1 ("The following words and phrases when used *in this title shall, for the purpose of this title,* have the meanings respectively ascribed to them in this section ...." (emphasis added)). Title 46.2 is captioned "Motor Vehicles." But significantly, the controlling case law discussed above—*Jones, Myers Motors,* and *Storm*—relates not to motor vehicles generally, but specifically to garage policies under Title 38.2, the Insurance title, and to the circumstances in which a purchaser will be deemed the owner for purposes of a coverage determination under a particular policy. Thus, the language of the Motor Vehicles title of the Code must give way to the context-specific language of the Insurance title of the Code found in § 38.2–2205(A), and to *Jones, Myers Motors,* and *Storm,* the cases construing that provision.

Moreover, any inconsistency between this authority and Va.Code § 46.2–100 must be resolved in favor of the more context-specific statute and controlling authority, given that the language of § 46.2–100 on which Transcontinental relies existed in the Virginia Code when each of the cited cases was decid-

---

12. *But see National Grange Mut. Ins. Co. v. Taylor,* 292 F.Supp. 986 (W.D.Va.1968) (holding that purchaser who had possession of car, signed application for certificate of title, and paid seller was owner of car, notwithstanding fact that certificate of title was in seller's name). To the extent that *Taylor* supports Transcontinental's position here, it is inconsistent with the prior controlling authority in *Storm* and *Jones* and with *Myers Motors,* and thus is unpersuasive.

ed.[13] In this regard, the General Assembly must be presumed to have been familiar with the case law on this issue, *see Dodson v. Potomac Mack Sales & Serv., Inc.*, 241 Va. 89, 400 S.E.2d 178, 180 (1991), and thus to have been familiar with any perceived conflict between § 46.2–100 and the line of cases cited above. Absent an amendment to the Code to rectify this conflict, the General Assembly must also be presumed to be in agreement with the results reached in cases such as *Storm* and *Jones,* and to have intended that the analytical framework of those cases be applied to circumstances such as those presented at bar.

Further evidence of the General Assembly's intent with respect to the inapplicability of § 46.2–100 to this case is found in the explicit reference in Va.Code § 38.2–2205, the omnibus insurance clause at issue here, to Va.Code § 46.2–472. This reference demonstrates that when the General Assembly intended a provision of the Motor Vehicles title to be read into a particular section of the Insurance title, it specifically included a cross-reference to that effect in the Code. There is no cross-reference in § 38.2–2205 or elsewhere suggesting that the definitions of § 46.2–100 should apply to Title 38.2; indeed, as noted above, § 46.2–100 provides definitions "for the purpose of this [Motor Vehicles] title" only. Thus, the principles announced in *Jones, Storm,* and the other cases, and not the language of § 46.2–100, must guide resolution of this dispute.

Application of these principles to the instant facts points persuasively to the conclusion that, when Dangerfield caused the accident on October 31, 1995, he was not the owner of the Bronco for purposes of coverage under the garage policy. When Dangerfield drove the Bronco off the HBL lot on October 21, 1995, he had signed a buyer's order, a retail installment contract, and a Maryland application for title. The buyer's order made purchase of the Bronco contingent on Dangerfield ultimately obtaining financing. Furthermore, HBL had agreed when it delivered the Bronco to Dangerfield that it would attempt to find a lender, and it subsequently submitted his application for financing to Chase Manhattan and Mercedes Benz Credit Corp; however, both lenders declined to provide Dangerfield financing. Consequently, HBL never issued Dangerfield a Maryland certificate of title. Yet, HBL had issued Dangerfield a temporary Virginia certificate of title. In Virginia, a temporary certificate of title is to be used only when the dealer is "unable at the time of the sale to deliver to the purchaser the certificate of title ... for any ... reason beyond the dealer's control." Va.Code § 46.2–1542.[14] Here the dealer in fact had the original certificate, which it did not transfer to the purchaser (Dangerfield) simply because Dangerfield had not yet obtained his financing. Thus, issuance of the temporary certificate in the circumstances was arguably not permitted under the statute, as HBL was not "unable" to deliver title for reasons "beyond the dealer's control."

In any event, full title never passed from HBL to Dangerfield. In this regard, and perhaps most instructive for the instant discussion, when Transcontinental received the salvage value for the Bronco after the accident, title for that car had to be transferred from HBL to CNA Insurance Companies ("CNA"), Transcontinental's parent company. To effectuate this transfer, HBL signed over and delivered the *original certificate of title* to CNA. That certificate was then, as it always had been, in HBL's possession, and it identified HBL as the owner of the vehicle. Thus, Transcontinental's and HBL's own conduct reflects that HBL, and not Dangerfield, was the owner of the Bronco at the time of the accident. It follows that the first prong of the coverage test is satisfied.

█ The second prong of the coverage provision in HBL's garage policy requires that customers not have their own applicable insurance if they are to be covered under the HBL policy. At the time of the accident, Dangerfield did not have insurance. Although he represented on the sale agreement

---

13. *See* Va.Code § 46.1–1(15) (1950); § 46.1–1(18) (1958); § 46.1–1(18) (1968).

14. The statute indicates that such reasons may include loss of the certificate or detention of the certificate by someone else in possession of it. *See id.*

that he did, this was inaccurate as he had allowed his policy to expire.[15] When Dangerfield applied for his financing, HBL did not investigate whether he had insurance, but instead relied on Dangerfield's representation that he did. Notably, the policy provides coverage to a customer who "[h]as no other available insurance"; it does not speak of the customer's "representations" of insurance or the insurer's "belief" that the customer is carrying other insurance, and thus these latter facts are irrelevant to the coverage determination.[16] Simply put, because Dangerfield did not have insurance at the time of the crash, and because he was not the owner of the Bronco, he was covered under the HBL policy.

### C. Existence of Bad Faith Conduct

■ The next question is whether there is a triable issue of fact concerning plaintiff's allegation that Transcontinental acted in bad faith when, notwithstanding the fact that it owed Dangerfield the contractual duties of an insurer under the policy, it refused to indemnify, defend, and settle the claims against him. "If[the insurer] is ultimately found not to have acted in bad faith, then [the insured] may only recover up to the policy's relevant coverage limitations.... But if [the insurer] acted in bad faith, then [the insured] may recover an amount in excess of the policy limits." *Spence–Parker v. Maryland Ins. Group*, 937 F.Supp. 551, 557–58 (E.D.Va. 1996). The test for determining whether an insurer has acted in bad faith is set forth in *CUNA Mutual Insurance Society v. Norman*, 237 Va. 33, 375 S.E.2d 724 (1989):

[I]n evaluating the conduct of an insurer, courts should apply a reasonableness standard. A bad-faith analysis generally would require consideration of such questions as (i) whether reasonable minds could differ in the interpretation of policy provisions defining coverage and exclusions; (ii) whether the insurer had made a reasonable investigation of the facts and circumstances underlying the insured's claim; (iii) whether the evidence discovered reasonably supports a denial of liability; (iv) whether it appears that the insurer's refusal to pay was used merely as a tool in settlement negotiations; and (v) whether the defense the insurer asserts at trial raises an issue of first impression or a reasonably debatable question of law or fact.

*Id.*, 375 S.E.2d at 726–27 (Roman numerals added).

■ The first *CUNA* factor, applied to the facts at bar, requires a determination of whether Transcontinental's conclusion that Dangerfield was the owner of the Bronco, and thus that that vehicle was not a "covered auto" under the HBL policy, was, though incorrect, nonetheless reasonable. To be sure, the foregoing discussion demonstrates that in the final analysis, Transcontinental's position regarding ownership of the Bronco cannot carry the day. Both Fourth Circuit and Supreme Court of Virginia precedent require a contrary result. This does not mean, however, that Transcontinental's interpretation of the relevant law was unreasonable. Indeed, the definition of "owner" in Va.Code § 46.2–100, on its face, would seem to lead naturally to the conclusion Transcontinental reached. Moreover, HBL had issued Dangerfield a temporary certificate of title, and thus Transcontinental reasonably could have believed that HBL had transferred ownership of the Bronco to Dangerfield even before the requisite financing was secured. To require Transcontinental to discern the flaw in its reasoning would hold the

---

**15.** Defendant suggests in its reply brief that "plaintiff's own Exhibits reflect that Mr. Dangerfield's insurance would not be canceled until November 6, 1995," one week after the accident. *See* Reply at 2–3 (citing Pl. Exh. 4). This is not persuasive. A cursory reading of Exhibit 4 discloses that, although Dangerfield's former insurer required that it receive a check for payment of premiums by November 6, if the check was not received by that date, "[t]he account will be canceled effective 10/14/95." In other words, the account would be canceled on October 14,

but if a check was received by November 6, the check would have retroactive effect and would "void" the earlier cancellation. Dangerfield did not send a check by November 6, 1995, and thus his insurance expired on October 14, 1995, seventeen days before the accident.

**16.** *See also* Va.Code § 38.2–2205(A) (mandating coverage under garage policies for any driver who does not have available insurance).

insurer to a standard much higher than can justly be imposed on those not trained in the law; the arguments presented by counsel in this matter demonstrate that even those with legal training might come to conflicting, yet reasonable, interpretations of the governing law.[17] Under this first factor, then, there is no showing of bad faith on the insurer's part.

The second and third factors of the *CUNA* test ask whether the insurer made a reasonable investigation of the claim, and whether the determination based on that investigation was also reasonable. Plaintiff suggests that Transcontinental did not investigate this claim, but instead simply refused outright to defend Dangerfield.[18] The record, however, does not support this allegation. To the contrary, Transcontinental's agent, Nancy Marquette, stated in answers to interrogatories propounded by plaintiff that she investigated the circumstances of the accident and the purchase of the Bronco from HBL, and that from that investigation learned of, and relied on, the following facts in her determination that Dangerfield was not owed a duty of coverage: (i) Dangerfield was not a party to the HBL policy, nor an additional named insured; (ii) Jim Burdis, HBL's used car sales manager, stated that the Bronco had been sold and delivered to Dangerfield with a temporary certificate of title and new tags, thereby giving Dangerfield an immediate right of possession; (iii) the police report from the accident indicated that Dangerfield was driving the Bronco and was the owner of it; and (iv) Va.Code § 46.2–100 supported the conclusion that Dangerfield was the owner of the car. In making her coverage determination, Marquette also relied on Dangerfield's representation on the conditional sales contract that he had his own insurance through another carrier, which, if true, would release Transcontinental from any obligation to indemnify Dangerfield. Certainly these facts establish that Transcontinental made a reasonable investigation of the coverage issue, and further that it reasonably (though incorrectly) determined that Dangerfield was not a covered driver.

The fourth *CUNA* factor asks whether the denial of coverage was part of the insurer's negotiation strategy. There is no evidence in the record that would support such a conclusion, and thus this factor does not provide any basis for an inference of bad faith.

Finally, the fifth factor requires a determination of whether the arguments advanced by the insurer present issues of first impression or present a "reasonably debatable question of law or fact." In the circumstances, they do both. While persuasive authority does discuss the effect of the absence of a certificate of title under an omnibus insurance clause, none of the cited cases addresses the contrary language found in the definition of "owner" in Va.Code § 46.2–100. Accordingly, the question whether these two sources of law could be reconciled, and if not, which one should control, was one of first impression in this circuit. Moreover, Transcontinental's contention both in its briefs and at oral argument that the statute was directly on point and thus dispositive, while ultimately not persuasive, certainly carried much force. In other words, the issue presented was a reasonably debatable question of law.

In sum, application of the *CUNA* test to the instant facts compels the conclusion that no reasonable jury could conclude that Transcontinental acted in bad faith in denying Dangerfield coverage.[19]

---

17. This Court reached a similar conclusion in *Spence–Parker*, 937 F.Supp. at 558:

 The exclusion provision in issue is undeniably ambiguous, a fact compellingly attested to by the lawyers' arguments here. The simple fact is that numerous reasonable minds could, and indeed did, differ about the interpretation of that provision. This [first *CUNA*] factor, therefore, points persuasively, if not conclusively, away from any inference of bad faith. To hold otherwise would require insurers to meet an unattainable standard of interpretive accuracy.

18. Plaintiff places much emphasis on the fact that once Transcontinental decided to provide a defense to HBL, it knew that Dangerfield was involved in the accident. From this plaintiff infers that Transcontinental must have been aware of the duty it owed Dangerfield. This inference does not follow, however; Transcontinental could very well have known that Dangerfield caused the accident, and yet it also could have concluded that he was not covered by the garage policy. Indeed, precisely this occurred.

19. Indeed, it is unclear whether this question could even be put to a jury were a genuine issue present. Because an analysis of the reasonable-

### D. *Damages Caused by the Breach*

██ Transcontinental also contends that, even assuming it breached its duties in bad faith, that breach did not cause Dangerfield any damages. Of course, given the conclusion reached above that Transcontinental did not act in bad faith, this issue is moot. Nevertheless, because the parties have argued this issue orally and in writing, a brief analysis of it is undertaken here.

Transcontinental bases its argument that it caused no damages on the testimony of plaintiffs' expert in the *Manesh* action, Mr. Holbrook, who stated that he had no reason to believe that, even if Dangerfield had been provided a defense in the Maryland action, judgment would not have been entered against him in the same amount of the final Maryland judgment. This statement is pure speculation,[20] and thus is not a sufficient basis for an award of summary judgment.

While Holbrook did state that Dangerfield was not harmed by Transcontinental's failure to defend, he added that Dangerfield *was* harmed by the insurer's failure to settle. Transcontinental asserts that it *did* attempt to settle this matter, and that it made an offer on behalf of HBL to settle the underlying *Manesh* case as to all defendants for $20,000; Transcontinental further alleges that this offer was never accepted. This assertion is supported by the affidavit of Warren Stephens, Esq., the attorney for HBL in *Manesh*. Stephens states that he called John Garza, Esq., the attorney for the injured plaintiffs in the *Manesh* case, twice in October 1996 and offered to settle for $20,000. Garza has submitted an affidavit to the contrary, stating that he never received a settlement offer from Transcontinental or from HBL. This affidavit is corroborated by the deposition testimony of Ms. Manesh— testimony curiously cited by *defendant*

here—that no settlement offer was ever made in the personal injury case.

Because there is a material dispute as to whether Transcontinental ever made a settlement offer on Dangerfield's behalf, summary judgment on this question, were the question reached, would be inappropriate.

### III

For the foregoing reasons, plaintiff is entitled to summary judgment with respect to his right to bring the instant action and on the issue of ownership of the Bronco for coverage purposes; and defendant is entitled to summary judgment on the issue of bad faith.

An appropriate Order has issued.

---

ness vel non of Transcontinental's conduct necessarily requires an analysis of the interplay between a series of judicial decisions and a state statute, the task seems to be one uniquely suited to a court, and not a jury.

**20.** Indeed, Holbrook·gave this answer at his deposition only after plaintiffs' counsel·objected that the question posed by defendant's counsel called for speculation.